# CHARLESTON

PENCE *et al. v.* CARNEY *et al.*

Submitted June 13, 1905.   Decided November 14, 1905.

1.   WATERS —*Percolating Waters.*
    All subterranean waters which do not exist in a known and well defined channel are deemed percolating waters.   (p. 300).

2.   SAME—*Subterranean Waters.*
    All subterranean waters are presumed to be percolating waters until it is shown that they exist in a known and well defined channel.   (p. 300).

3.   SAME.
    Under the facts and circumstances appearing in this case the waters in controversy are held to be percolating waters.   (p. 301).

4.   WATERS, REASONABLE USE OF—*Percolating Waters.*
    The owner of land who explores for and produces subterranean percolating water within the boundary of his land is limited to a reasonable and beneficial use of such water, when to otherwise use it would deplete the water supply of a valuable natural spring of another on adjoining or neighboring land and thereby materially injure or destroy such spring.   (p. 303).

5.   WATERS—*Diversion of Waters—Injunction.*
    The mere temporary pumping to a reasonable extent of percolating water from a well being sunk by the owner of land within his boundary in good faith for the purpose of completing the well for legitimate use, and the casting of such water upon the land of such owner, is not such unreasonable use or waste of the water as will sustain an injunction against such temporary pumping, notwithstanding such pumping may temporarily decrease the supply of water to a valuable natural spring of another on adjacent or neighboring land.   (p. 303).

6.   INJUNCTION—*Irreparable Injury—Evidence.*
    In order to sustain an injunction against an act of trespass on the ground that the injury occasioned thereby is irreparable, the facts constituting such irreparable injury must be alleged and proved.   (p. 307).

7.   APPEAL—*Review —Decree—Contempt.*
    A final decree in a suit in equity will not be reversed by this Court at the instance of the plaintiffs because, at the time of its entry, a rule was pending and undetermined against the defendants for violating a temporary injunction awarded in the suit, when it appears that the hearing of the rule had, previous to the final hearing, been continued by an order entered by consent of both parties and that the final hearing was on motion of the plaintiffs to perpetuate the

injunction, and that no objection to such final hearing was made by them in the court below. (p. 307).

Appeal from Circuit Court, Summers County.

Bill by A. P. Pence and George N. Davis against B. E. Carney and others. Decree for defendants, and plaintiffs appeal.

*Modified.*

T. N. READ and VINSON & THOMPSON, for appellants.

J. W. KENNEDY, BROWN, JACKSON & KNIGHT, and JOHN WEHRLE, for appellees.

COX, JUDGE :

A. P. Pence and George N. Davis filed their bill in equity in the circuit court of Summers county against A. C. Blair and B. E. Carney to enjoin them and their agents from unreasonably and unusually abstracting and using the water from a well sunk by them on a tract of land owned by them and from casting the same on their land, whence it flowed upon plaintiffs' land. Upon presentation of the bill a temporary injunction was awarded. Defendants demurred to the bill and filed their answer. Depositions were taken and the case submitted for final hearing on March 29, 1905, on the pleadings and depositions and upon the motion of defendants to dissolve the injunction and the motion of the plaintiffs to perpetuate the injunction, and the court entered a decree sustaining the demurrer to the bill, dissolving the injunction and dismissing the bill. From this decree an appeal was allowed the plaintiffs by this Court.

The errors assigned involve a consideration of the whole case. It appears from the record substantially as follows: Plaintiffs Pence and Davis are the owners of a tract of land of two hundred and eighty-three acres, upon which there is a valuable spring called Pence's Spring, known as a flowing spring as far back as 1849. So long as known by witnesses, unless interfered with by some mechanical obstruction, and until the acts of defendants complained of, this Spring has flowed continuously unaffected by rainfall. The water of this Spring is supposed to contain valuable curative and medicinal qualities, and has been widely advertised by sample. Some years ago certain improvements were made to this Spring. At that time an excavation was made to a depth of

about fourteen feet, where the water supplying the Spring was found to issue forth or flow in a constant and well defined stream, or, as some of the witnesses say, to boil up through a well defined crevice about ten inches long and one and one-half inches wide, in a rock, with well defined walls. Plaintiff Pence is the owner of one acre of land adjoining the two hundred and eighty-three acres. Upon it he has erected and maintains a valuable hotel and hotel plant and has secured from his co-plaintiff his interest in the two hundred and eighty-three acres at a rental of $1,000.00 a year for twenty-five years from November 28, 1901. The water from Pence's Spring is used to supply the guests and patrons of the hotel, who frequent it for the purpose of using this water; and by reason of the use of this water the hotel plant and property are greatly increased in value. Plaintiff Pence also uses this water commercially, shipping it to various points in this and adjoining states. Defendants Blair and Carney, having purchased a tract of nineteen acres adjoining the two hundred and eighty-three acres, recently began to explore for the same kind of water as that flowing from Pence's Spring, and after some unsuccessful efforts, sunk a well on their land and at a depth of fifty-eight feet below the surface found water, which the evidence tends to show was in taste and effect like that flowing from Pence's Spring. According to some of the evidence the water supplying the well came into it through a crevice in the rock, practically in the same manner that the water came into Pence's Spring. Some of the evidence tends to show that the well was supplied by two such streams coming into it from different directions. After water was found in the well defendants placed therein a steam pump of large capacity, producing, as some of the witnesses say, from sixty to seventy gallons of water per minute, which was cast upon defendant's land whence it flowed upon plaintiffs' land. About twenty-four hours after the pump was started, the flow at Pence's Spring began to subside, and the pumping being continued, the flow at the Spring ceased. Before the pumping there was no visible effect upon the Spring by the sinking of the well and the finding of water therein. After the injunction was awarded the pumping was discontinued for a time, with the effect that the water at the Spring began to rise in the receptacle placed over it and continued to rise

until the water flowed out from the receptacle, but not in as great quantities as before any pumping was done. Sometime afterwards the pumping was resumed and was again discontinued with like effect upon Pence's Spring, as in the first instance. The well, according to the evidence of plaintiffs, is from 1,000 to 1,100 feet, and according to the evidence of defendants, 1,350 feet from Pence's Spring. The well is twenty-five feet, higher than the Spring according to surface elevation. The tracts of land mentioned are located along Sulphur Spring Branch of Greenbrier river in Summers county, in a narrow, irregular valley. Sulphur . Spring Branch is a running surface stream of water with well defined banks. Until the improvements were made to Pence's Spring, its overflow ran in a stream with well defined banks a distance of about twenty feet and there emptied into Sulphur Spring Branch. The nineteen acre tract belonging to defendants is located farther up the valley than the lands of plaintiffs. On either side of this valley the mountains rise abruptly. By defendants' answer it is substantially denied that the waters supplying their well were from a known subterranean stream with well defined channel, or that their pumping was unreasonable, or that they acted otherwise than lawfully, or that they had any intent to injure plaintiffs' Spring thereby; but they claimed that the pumping was necessary in order to complete the well and make it useful to them in their contemplated business of running a hotel and furnishing water to the patrons thereof and to the general public.

The subject of this controversy is subterranean water. Some of the questions involved are comparatively new in the courts of this State and are of great importance. It has been truly said that the two fundamental principles underlying the consideration of the rights of adjacent or neighboring owners of land in subterranean waters are : first, that the owner of land owns from the surface upward to the sky and downward to the center of the earth; and second, that the owner must so use his own as not to injure another. Some courts have emphasized one of these principles almost to the exclusion of the other, but the greater number have made an effort to apply both in harmony. Many authorities for the purpose of applying these principles have divided subterranean waters into two classes: first, underground

bodies or streams of water existing in known and well defined channels; and second, underground waters which ooze or percolate through the earth, or percolating waters; and have endeavored, as far as practicable, to apply the rules of law applicable to surface streams or bodies existing in well defined channels, to the like streams or bodies existing underground. 30 Amer. & Eng. Enc. of Law, 311; *Miller* v. *Black Rock Springs Co.*, 99 Va. 747; *Wheelock* v. *Jacobs*, 67 Am. St. Rep. 659, and note; *Frazier* v. *Brown*, 12 Ohio St. 294.

Underground waters are presumed to be percolating waters until it is shown that they exist in known and well defined channels. 30 Amer. & Eng. Enc. of Law 311; *Boyce* v. *Cupper*, 37 Ore. 256; 10 Am. & Eng. Dec. in Equity, 716, and cases there cited.

The burden of proof, then, is upon the plaintiffs in this case to show that the waters in controversy exist, in a known underground stream with well defined channel, if they would have the law of a similar surface stream apply here. It appears that upon the pumping of defendants' well, the supply at Pence's Spring was depleted, and upon the continuance of the pumping, that the flow at Pence's Spring ceased, and that this operation was repeated with a like effect on the Spring; and that at the points where the water came into the well and into the Spring, there were well defined crevices in the rock, but these facts do not show the existence of a stream with a known and well defined channel for the entire distance between the well and the Spring, or that both do not receive their supply from a saturated area or stratum extending under the lands of both plaintiffs and defendants. *Taylor* v. *Welch*, 6 Ore. 198; *Ocean Grove Assn.* v. *Comrs.*, 40 N. J. Eq. 447; *Cole* v. *Bacon*, 63 Col. 571; *Clark Co.* v. *Lumber Co.*, 80 Miss. 535; *Huber* v. *Murkel*, 62 L. R. A. 589; 10 Am. & Eng. Dec. in Eq. 693.

The underground waters which the law recognizes as existing in underground bodies or streams in well defined channels are those, and those only, which are known to so exist, or that they do so exist is ascertainable or discoverable from surface indications or other means, without subsurface excavations for that purpose. *Black* v. *Billymena Com'rs.*,

17 Lr. L. R. 459; *Lybe's Appeal*, 106 Pa. St. 626; *Haldeman* v. *Breckhardt*, 45 Pa. State 519; 67 Am. State Rep. 665.

No surface indications other than the facts hereinbefore detailed are shown indicating a known and well defined underground stream. We think that the facts appearing, taken together, are insufficient to overcome the presumption that the waters in controversy are percolating waters, and tend rather to show that both the well and the Spring receive their supply from an underground saturated area or stratum extending under the lands of both plaintiffs and defendants. We shall therefore treat the waters in controversy as underground, percolating waters.

The early, and we may say the general rule, was that underground, percolating waters belong to the soil and that the owner of the land may search and explore for and obtain them at will and use them at pleasure, though in so doing he may drain or entirely divert such waters from the lands of adjacent or neighboring owners to which they would otherwise necessarily pass. This seems to be the rule in England and the rule followed in nearly all of the early and some of the later American cases. *Acton* v. *Blundell*, 12 Mees. & W. 324; *Chasemore* v. *Richards*, 7 H. L. Cas. 349; *Eward* v. *Bellfast*, L. R. 9 Ir., 172; 10 Am. & Eng. Dec. in Eq. 694, and cases there cited; 30 Am. & Eng. Enc. of Law, 310-11-12; *Miller* v. *Black Rock Springs Co.*, 99 Va. 747. Of the English cases and of the common law on this subject, Mr. Farnham in his late comprehensive work on "Waters and Water Rights," vol. 3, page 2718, says: "When it is remembered that the first English case dealing with percolating water arose in 1840, and that it was not decided that the land owner might exhaust the water to furnish a municipal water supply until 1860, it will be at once seen that there was no English law on the subject at the time the common law was adopted by statute, in most of the American states, and that the opinion of the American courts as to what is the common law is as good as subsequent decisions in English courts. Therefore, in any case, the question can be decided on its merits, giving the English decisions the weight to which they are entitled, but without the necessity of regarding them as binding precedents."

Under the early rule, considered without limitation or

qualification, there were no correlative rights between adjoining or neighboring owners of land in underground, percolating waters. Can it then be said in these days' of powerful machinery and modern appliances, when it is possible for one land owner to drain the lands of a neighborhood, or section of country, of their underground water and thus render them practically valueless, that underground, percolating waters are wholly without the protection of the law, that they, like the wild animal, belong alone to him who first obtains possession of them? Such an instance of draining a whole section of country was found and held to be unlawful in the case of *Forbell* v. *New York*, 164 N. Y. 522. While the early rule, both in England and this country, is as stated above, the weight and trend of the recent authorities and cases in America are to qualify the early rule by limiting the use by the owner of the land who searches therein and produces percolating water to a reasonable and beneficial use of such water, where to use it otherwise would deprive the owners of adjacent and neighboring lands of the enjoyment of the waters of their lands.

In Vol. 30 of Am. & Eng. Enc. of Law (second Ed.), issued in 1905, after noting the general or early rule, it is said: "In the later cases the right of a land-owner to intercept and divert percolating waters has been subjected to some qualifications, on the ground that such right relates to the beneficial use of the waters or of the land for some purpose connected with the ordinary operations of agriculture, mining, domestic use, or improvements, either public or private. Under this doctrine it has been held that a land owner has no right, except for the benefit and improvement of his own premises, or for his beneficial use, to drain, collect, or divert percolating waters therein, where such act will destroy or materially injure the spring of another, the waters of which spring are used by the general public for domestic purposes; that he cannot drain, collect, or divert such waters for the sole purpose of wasting them."

In Mr. Farnham's work on "Waters and Water Rights," issued in 1904, Vol. 3, page 2712, it is said: "It has been said that there are no correlative rights existing between proprietors of adjoining lands in reference to the use of waters in the earth or percolating under its surface. And

many cases have been decided upon this principle. But the attempt to act .upon that doctrine very soon forces the conclusion that percolating water is not an exception to the general rule that rights in organized society are not absolute, but correlative, and that one man cannot be permitted to exercise any right if the direct effect of his act would be an injury to his neighbor." This subject is treated extensively in the note to the case of *Barclay* v. *Abraham*, 10 Am. & Eng. Dec. in Eq., issued in 1905. At page 704 it is said: "It may be said to be now the generally accepted doctrine, in the United States, that the rights of the owner of the soil to percolating waters are limited to the use for proper purposes, connected with the natural enjoyment of his property. Thus, while the early cases held that any one might abstract the percolating water from his land, and convey it to a neighboring town or village for sale to others—and this would seem to be still the rule in England—the modern cases have adopted the rule that the right of the land-owner to divert or consume percolating water does not extend to authorizing the destruction of a stream, pond, spring or well, by cutting off its natural source of supply, when the acts that produce that result are not done for the beneficial use and enjoyment of the land on which they are done, but for the sole purpose of gathering the water and conveying it to a distant place for the use of strangers, who have no right thereto as against the owners of the neighboring lands; and this rule is applied with especial strictness when the percolating water is abstracted by artificial and powerful means, so as to create an unnatural and forced drainage, and a corresponding depletion of the natural water-supply. Accordingly, when such abstraction of the percolating water effects a large extent of territory, and creates a permanent lowering of the underlying water-table so as to cause serious and permanent injury to the land of others and unfit it for profitable cultivation, the land-owner whose acts cause the injury will be liable in damages, and will be enjoined from continuing his unlawful acts. The rule applies to municipal corporations and water companies equally with individuals." See also the many cases cited at page 705. At page 706 it is said: "According to the best considered cases, the early doctrine must also be limited so as to permit only a *reasonable* use of the percolating water underlying the land;

and it is accordingly held that if such water is drawn off, not in the *bona fide* enjoyment of the defendant's property, but for no beneficial purpose, and *a fortiori* if it be drawn off maliciously, he may be enjoined from so doing, especially if the interests of the public would otherwise suffer, though the water be used colorably for some purpose of benefit to himself." At page 721 it is said: "The modern doctrine applies with especial force to the case of mineral springs fed by percolating waters, on account of the great value of many of these springs, and the magnitude of the injury that may be caused by an interference with their source of supply." *St. Amend* v. *Lehman*, 120 Ga. 253.

Mr. Freeman, who appended a lengthy note to the case of *Wheelock* v. *Jacobs*, 67 Am. State Rep. 659, also appended a note on the same subject to the case of *Katz* v. *Wilkinshaw*, (Cal.), 99 Am. State Rep. 66, issued in 1904. In the later note he says: "In our note to the case of *Wheelock* v. *Jacobs*, 67 Am. State Rep. 659, we treated only the question of what waters are percolating, perhaps under the impression, which the later and best considered cases do not sustain, that when this question was solved and the answer reached, that the waters in question were percolating, no other inquiry need be made, except to ascertain on whose lands they were found, when used, appropriated, or otherwise interfered with." At page 71 he says: "The very decided weight of authority supports the proposition that the land owner has no right by anything done on his land to waste, whether through malice or indifference, the percolating waters there found, or which he therein develops or brings to the surface by means of ditches or wells, with or without pumping apparatus, if by such waste the neighboring land owner is deprived of percolating waters which otherwise would be within his land and which he there has a necessity for using." See authorities there cited. Tending to sustain the later doctrine of reasonable and beneficial use of underground percolating waters see *Bassett* v. *Manufacturing Co.*, 43 N. H. 569; *Sweets* v. *Cutts*, 50 N. H. 439; *Katz* v. *Wilkinshaw*, 141 Cal. 116; *Barclay* v. *Abraham*, 121 Ia. 619; *McClintic* v. *Hudson*, 74 Pac. Rep. 849; *Forbell* v. *New York*, 164 N. Y. 522; *Reisert* v. *New York*, 66 N. E. Rep, 731; *Smith* v. *Brooklyn*, 160 N. Y. 357; *Willis* v. *Perry*, 26 L. R. A. 124;

*Stillwater Co.* v. *Farmer*, 89 Minn. 58; *St. Amend* v. *Lehman*, 120 Ga. 253; *East* v. *R. R. Co.*, (Tex.) 77 S. W. Rep. 646; *Gagnon* v. *French Lick Springs Co.*, 72 N. E. Rep. (Ind.) 849; also note by Mr. Farnham published since his work on "Waters and Water Rights," 64 L. R. A. 336.

We must yield assent to the later doctrine of reasonable and beneficial use, which constitutes rather a qualification of the early rule than an announcement of a new rule. The later doctrine seems to us to be sustained by the weight of authority as well as by the weight of reason. What is a reasonable and beneficial use under this later doctrine must be determined in the light of the facts and circumstances appearing in each case as it arises. We do not desire to be understood as announcing any fixed rule applicable to all cases as to the question of what constitutes such reasonable and beneficial use. Such reasonable and beneficial use has often been understood and held to mean, use for any purpose for which the owner of the land, upon which underground, such percolating waters are found, might legitimately use and enjoy his land. 30 Am. & Eng. Enc. of Law 314; 10 Am. & Eng. Dec. in Eq., *supra.*

By the later doctrine, is not much of the difference between the rules of law governing underground streams existing in well defined channels, and the rules of law applicable to underground, percolating waters virtually extinguished? It may be so, but we do not decide here that it is so. We must keep in mind, however, in investigating the subject here involved, the fact that water in some form is necessary to the very existence of man and to the enjoyment of his land. Without it his land becomes a desert, of no value for agricultural purposes and unfit for habitation. In this respect, water may be unlike oil or gas, or other such subterranean substances, which, while useful to man, are not absolutely necessary to his existence or to the enjoyment of his land and may be abstracted therefrom without destroying the value of the land. These substances may be termed merely commercial products, but we are not deciding any question in relation to these products termed commercial products.

Applying the law to this case, we believe that the facts alleged in the bill, if sustained by proof, are sufficient to entitle the plaintiffs to relief in equity, and the demurrer to the

bill should have been overruled. The bill proceeds upon the theory that the waters tapped, and abstracted from defendants' well were supplied by an underground stream existing in a known and well defined channel, but the evidence does not support this theory; nor does it, in our judgment, sustain the theory of an unreasonable and non-beneficial use by defendants of the water produced from their well. The defendants' contention that the pumping and wasting of the waters from their well, shown by the evidence, were merely temporary and done in good faith for the purpose of completing the well for legitimate use, seems to be sustained. The evidence of plaintiffs in a great measure sustains the contention of defendants, that the pumping was only temporary and without malice and for the purpose of completing the well for use. On cross examination plaintiff A. P. Pence testified as follows:

"Q.—In operating this well, do you know what pumping was or was not necessary in operating it as they were operating it?

A.—They pumped the water out so they could work down in there.

Q.—Wasn't it necessary to pump the water out so they could work down in there?

A.—It might have been necessary; I wasn't there.

Q.—Don't you know they could not work down in that well with that shaft with the water and without pumping it out?

A.—No, I don't see how they could have worked without pumping the water out."

J. D. Pence, a son of plaintiff A. P. Pence, on cross examination testified as follows:

"Q.—The pumping that you have spoken of from this well was necessary in the operation of sinking the well, wasn't it?

A.—That depends upon how you have reference to sinking the well.

Q.—Is that as far as you can answer this question?

A.—It is, until I know further about how the well is to be sunk.

Q.—Don't you know how that well was being sunk?

A.—It was sunk by means of a steam drill, and also by means of pick and shovel.

Q.—Then you do know how this well was being sunk, do you?

A.—I do.

Q.—I will ask you again if this pumping was not necessary in the operation of sinking this well, as it was being sunk?

A.—As they were working at it I should say it was."

This evidence seems to be conclusive. We cannot say that the pumping and wasting of the water from defendants' well was such an unreasonable use of the water as to violate the rule of reasonable and beneficial use by defendants. We hold, therefore, that plaintiffs were not entitled to a perpetuation of the injunction against such temporary use of the water from defendants' well as is disclosed by the evidence.

Plaintiffs claim that under the allegations of the bill they were entitled to have the injunction perpetuated because defendants had cast the water upon the earth and the same had flowed upon and over plaintiffs' land, by reason whereof the damage to plaintiffs was irreparable. There is no allegation that defendants were insolvent, and no facts constituting irreparable injury are alleged in the bill or shown by the evidence in relation to the water which flowed upon plaintiffs' land, and plaintiffs were not entitled to a perpetuation of the injunction on the ground that such trespass or injury was irreparable. See *Farland* v. *Wood*, 35 W. Va. 458; *Becker* v. *McGraw*, 48 W. Va. 539; *Merriner* v. *Merriner*, 54 W. Va. 169.

It is claimed that the motion to dissolve the injunction should not have been considered at a time when a rule was pending and undetermined against defendants for violating the injunction. On the 13th day of January, 1905, an order was entered by consent of both parties, continuing the consideration of the rule. This cause was submitted for final hearing, among other things, upon motion of plaintiffs to perpetuate the injunction, without having the question of the rule determined. No objection to the final hearing was made in the court below because of the pendency of the rule, and we think, under these circumstances, that the decree cannot be reversed because of the pendency of the rule, at the instance of the plaintiffs. *Endicott* v. *Mathis*, 9 N. J. Ch. 110; *Crabtree* v. *Baker*, 51 Am. Rep. 424; *Hebb* v. *County Court*, 48 W. Va. 279. It appears to us from the whole case that

the lower court did not err in dissolving the injunction and dismissing the bill, but in our judgment the decree in this cause should be without prejudice, as hereinafter indicated.

For the reasons stated it is ordered that the decree of the circuit court entered in this cause on the 29th day of March, 1905, be modified so as to overrule the demurrer to the plaintiffs' bill, and, as modified, that the same be affirmed without prejudice to the right of the plaintiffs to proceed by a bill for an injunction, or otherwise, against the defendants for any future unlawful extraction, use or waste of said underground water which may be found or obtained upon their lands, resulting in injury to the property or rights of the plaintiffs.

*Modified and Affirmed.*