# CHARLESTON

JOHNSON *v.* GOULD *et al.*

Submitted January 11, 1906.    Decided February 20, 1906.

1. EASEMENTS—*Partition.*

Upon partition of real estate descended, between heirs, each heir takes his share of land subject to any apparent, permanent, continuous and reasonably necessary *quasi* easement which existed thereon, for the benefit of another part of such real estate, at the death of the ancestor, unless the existence of such *quasi* easement has been discontinued by the heirs before partition, or provision is made by the partition for its discontinuance. (p. 91.)

2.  SAME—*Interchangeable Deeds—Interference with Easement.*

Upon partition of a farm descended from an ancestor, between his heirs, by what is termed an interchangeable or partition deed, whereby they in effect provide for the continuance of an apparent, permanent, continuous and reasonably necessary *quasi* easement, which existed at the death of the ancestor, upon a part of the farm for the benefit of another part thereof, and convey to one of the heirs the servient part and to other of the heirs the dominant part, the one to whom the servient part is thus conveyed has no right to so change the physical condition thereof as to materially and permanently interfere with or destroy such easement.   (p. 94.)

3.  WATERS AND WATER COURSES—*Easement—Obstructions.*

Where such easement consists of a right to a supply of water naturally issuing or flowing from the servient land, the owner thereof has no right to cut off or materially impair that supply by making excavations, tunnels, walls or other constructions on the servient land.   (p. 96.)

4.  EASEMENT—INTERFERENCE WITH—*Injunction.*

A court of equity has jurisdiction, by injunction, to prevent a continuing material interference with an easement.   (p. 97.)

Appeal from Circuit Court, Wood County.

Bill by Nannie K. Johnson against Fannie M. Gould and others.   Decree for plaintiff, and defendant Gould appeals.

*Reversed.*

V. B. ARCHER and WM. BEARD, for appellant.

DAVE D. JOHNSON and VAN WINKLE & AMBLER, for appellee.

COX, JUDGE:

This cause is upon the rehearing of an appeal from a final decree of the circuit court of Wood county.   We adopt the substance of the statement of the case made by Judge Miller, who delivered the former opinion.

Eppa T. Bartlett was in his lifetime the owner of a certain farm in Wood county, described in the record of this case as the "Home Farm," situate near Parkersburg.   This farm was divided by a public road.   East of the road, and bounded thereby, was a lot measuring 125 feet on each of its four sides, known as the "spring lot," and other land belonging to said farm.   Upon the land west of the road were ice ponds, an ice plant, and some buildings.

In 1893, said Eppa T. Bartlett died intestate, survived by Martha Bartlett, his widow, John J., Gertrude O. and Sallie Bartlett, and Fannie M. Gould (nee Bartlett), his only children and heirs at law.    By a writing dated the 27th day of April, 1893, the said children, and the husbands of Gertrude O. Bartlett and Fannie M. Gould, agreed upon the division of the estate of which Eppa T. Bartlett died seized. It was therein provided that the "part of the home farm lying. east of the center of the public road, except the spring lot, shall be conveyed to said Fannie M. Gould"; that the part thereof west of the center of said road, and also the spring lot, "embracing the ice ponds, ice houses, engine and machinery, and. two tenement houses,  *   *   * shall be conveyed to Gertrude O. Bartlett and Sallie Bartlett jointly." It was further provided therein that "the free use and access to the spring lot and spring, for stock, farm uses and all domestic purposes, shall be perpetually reserved to the lands east of the road, but so as not to interfere with the protection of the spring, and its flow to the ice pond." This agreement was consummated by an interchangeable or partition deed, executed on November 22nd following, whereby the proper parties conveyed, quit-claimed and released to the grantees therein the several estates mentioned in the partition agreement.    In the grant therein to Gertrude O. and Sallie Bartlett was the clause:  "But there is reserved to the lands hereinafter mentioned, and conveyed to Fannie M. Gould, the free use and access to the said spring lot and spring, for stock, farm uses and all domestic purposes, but so as not to interfere with the protection of the said spring, and its flow to the ice ponds on the west side."  In the part of the deed conveying to the said Fannie M. Gould the land east of the public road, except the spring lot aforesaid, was the provision:  "Also the free use and access to the spring lot and spring, for stock, farm uses and all domestic purposes as aforesaid."  The conveyances by this deed were subject to the widow's dower.   Sallie Bartlett subsequently died testate.    By her will, her undivided interest in the estate owned jointly by her and Gertrude O. Bartlett, being the lands on the west side of the road and also the spring lot, was devised to her mother, Martha, for life, and after her death to plaintiff, Nannie K. Johnson.

Afterwards Gertrude O. Bartlett brought a suit against Eppa T. Bartlett's administrator, his widow, Martha, Nannie K. Johnson, Fannie M. Gould, and others, to assign dower in the land of which Eppa T. Bartlett died seized, and to partition the land conveyed by the interchangeable deed to Sallie and Gertrude O. Bartlett jointly. The commissioners appointed in that suit reported "that all the parties to whom allotments and partitions have been made of the home farm, shall at all times have the free use and access to the said 'spring lot' and spring aforesaid, to obtain water for stock, farm uses, and all domestic purposes, but so as not to interfere with the protection of the said spring, and its flow to the ice ponds on the west side of the public road." By decree of January 11, 1896, the report of the commissioners was confirmed, the decree containing exactly the same language used by the commissioners with reference to the rights of the several parties to the spring lot and spring. The land west of the road, designated by the commissioners as lot No. 4, and also the spring lot, were decreed to Martha J. Bartlett for life, and after her death to Nannie K. Johnson; and that part of the land east of the road, designated by the commissioners as lot No. 6, not including the spring lot, was also decreed to said widow for life, and after her death to Fannie M. Gould. Upon the death of said Martha J. Bartlett, on December 29, 1899, the title to lot No. 4 and to the spring lot became absolute in Nannie K. Johnson; and the title to lot No. 6 became absolute in Fannie M. Gould.

On the 28th day of August, 1899, Fannie M. Gould filed her bill in chancery against Nannie K. Johnson and others, and obtained an injunction inhibiting them from interfering with her right of free access to, and use of, said spring lot and spring in the manner theretofore enjoyed. Certain criminal proceedings against sons of Fannie M. Gould, Cecil R. and Earl Gould, for the removal of a part of said fence, which act was claimed to be a trespass, were enjoined.

After the death of Martha J. Bartlett, Nannie K, Johnson filed her cross-bill in said cause against Fannie M. Gould and others, alleging therein the foregoing facts and many other facts, and claiming to be entitled to the rights and priv-

ileges under the several contracts and decrees with reference to the said spring lot and spring.

She further alleged that for many years prior to the death of Eppa T. Bartlett, he had resided upon the land east of said road; that upon the land west of said road he had constructed and maintained for many years large ice ponds, and an ice plant and that for more than thirty years the ice procured therefrom had been of special value on account of its purity; and had produced a large revenue; that said spring was of large volume; that it had been known for more than a century, and had been called the "Bartlett Spring" for forty years; that in 1884 said Bartlett placed a line of tiling from the spring to a point near the line between lot No. 6 and the spring lot; and that all of the parties to said contract and deed had been familiar from childhood with the situation and condition of the lands partitioned, and that the values were agreed upon with the distinct understanding that the spring should be forever maintained.

She further alleged in her cross-bill that, within a short distance (shown by the evidence to be about 22 feet) from the line dividing the spring lot from the land of Fannie M. Gould, the latter and her sons had dug down into her (Mrs. Gould's) lands for a distance of more than 20 feet and to the depth of about 8 feet, and had struck the subterranean stream of water which supplied said spring, cutting off the stream and wholly preventing its flow to the spring; that, in the excavation so made into the hill or bluff and across the channel of said stream, Mrs. Gould and her two sons had built a brick tunnel; that the wall thereof, on the side next to the spring lot, is of solid masonry, cemented so as to be absolutely impervious to water, thereby wholly obstructing said stream; that a large and copious flow of the water, thus hindered, is now carried down to the public road and conveyed, through tiling, along the western boundary of said spring lot and upon the highway, and thrown to waste in a branch of Pond Run, which is below the level of the said Johnson's ice ponds.

Fannie M. Gould filed her demurrer and answer to said cross-bill, denying that she was bound to maintain or protect the supply of water in said spring on the spring lot,

and admitting, and claiming the legal right to make the excavations upon her own land. She also admitted the placing of the tiling drain upon the public road, but averred that it was done under authority of the county court.

Upon final hearing at January term, 1902, the court decreed, among other things, that "Fannie M. Gould has the absolute right to put down the spring on her premises, as she has done, and to take and use the water therefrom for any lawful purpose or use that she may find for said water, and that the supply of water to said spring is from percolating water and not from a subterranean stream, and that she has the right to take all the water that she can procure from said spring, and to dispose of the same as she may see fit, either by selling the same or using the same for her own purposes."

"That said Fannie M. Gould be restrained from maliciously or negligently maintaining any obstruction or construction placed by her on her own premises that interferes with or obstructs the flow of water to the said spring on the said spring lot, and thereby interfering with the flow of said water to the said ice ponds; and she is further enjoined, inhibited and restrained from maliciously or negligently maintaining any structure, outlet or other device which so lowers the level of the water on the land of Fannie M. Gould as to interfere with the supply of water to the said spring on the said spring lot as it existed prior to the opening of the spring on her own premises by the said Fannie M. Gould; provided, that on restoring the flow to the spring on the spring lot the said Fannie M. Gould, her heirs and assigns, shall have the right to make full use of the water either at that spring or at the spring upon her own premises, for stock, farm use and domestic purposes, as hereinbefore mentioned.

"If the said Fannie M. Gould shall desire to maintain a spring or opening for water on her own land, she is not enjoined from so doing, or from using water therefrom."

It was also provided that the defendant, Fannie M. Gould, should, under the direction of the sheriff of Wood county, by a proper construction, "raise the water in her spring one foot, so as to, if such construction will do

so, restore the flow of water to the spring on the spring lot."

From this decree Fannie M. Gould appealed, assigning various errors, all of which amount to the assertion that she owns her land in fee without reservation or servitude, express or implied, and that she owns the water in and under her land, and has the right to the free use and unlimited disposition thereof. Mrs. Johnson cross-assigns error, and in effect says that her full legal rights are not secured by said decree.

It appears from the record in this case that the old spring, known as the "Bartlett Spring," is located on the northeast corner of the spring lot. It is a basin in the ground, walled with brick. Some of the witnesses have known it for sixty years. The water is led into it by a pipe or tiling, laid several years ago by said Eppa T. Bartlett, from the spring to a point near the line of the land now owned by Mrs. Gould. The bed of this tiling is sand and gravel. This tiling, some parts of which are now visible, extends in a southeasterly direction about 40 or 50 feet toward the new spring on the lands of Mrs. Gould. The two springs are about 135 feet apart. There is evidence that, when said Bartlett put in this tile, he dug down into the sand and gravel, and followed the vein of water which supplied the old spring, back toward the bluff or hill. The evidence tends to prove that the tiling was put in for the double purpose of preventing the water, before it reached the spring, from being diverted into the Shattuck ditch and Pond Run, whose water levels are lower than that of the ice pond, and also to lead the water to the spring, from which it would flow to the ice ponds.

The foregoing is the substance of what we deem to be the material parts of the statement of facts made by Judge Miller.

The cross-bill in all respects seems sufficient in law.

Eppa T. Barlett, the ancestor, owning the whole farm upon which this spring, known as the "Bartlett Spring," with its abundant flow of water, was located, maintained ice ponds on part of his farm for the production of ice, which was of value commercially. He connected the spring to the ice ponds by means of pipe or tiling. The spring received its supply from

the bluff lands now owned by Mrs. Gould, then a part of
the farm.  He placed pipe or tiling from the spring to a
point near the line of the land now owned by Mrs. Gould,
for the purpose of carrying the water to the spring. By
these means, he annexed the water supply to the spring, and
the water of the spring to the ice ponds.   Thus, the ances-
tor impressed upon the land now owned by Mrs. Gould the
*quasi* servitude of supplying water to the spring by means
of the pipe leading to it, and upon the spring the *quasi* ser-
vitude of supplying water to the ice ponds. These *quasi* servi-
tudes were apparent, permanent, continuous and reasonably
necessary to the enjoyment of the farm.   They existed for
years prior to and at the time of Eppa T. Bartlett's death.
Afterward, by written agreement and by partition deed
(called in these proceedings "interchangeable deed"), the
farm was partitioned in severalty into two parts.   At the
time of this partition, the conditions as to the spring and its
supply and the ice ponds remained practically as they were
at the death of the ancestor.   No change in the condition of
the land as to water supply is shown to have occurred while
the widow held a part of the land as dower.   Whether the
supply of water issuing from the land of Mrs. Gould was a
well defined stream or percolating water, is immaterial for the
purpose of our present discussion.

We must presume that the values of the respective parts of
the farm in their then condition were taken into considera-
tion by the parties in making the partition.   *Burwell* v.
*Hobson*, 12 Gratt. 322.   Considering the partition deed as
simultaneous conveyances or grants of the respective parts to
the persons to whom conveyed, we will examine the legal
questions involved.

Dr. Minor, in his Inst., Vol. II, p. 26, says: "Thus it
is the established doctrine that where the owner of two her-
itages, or of one heritage consisting of several parts, has so
arranged and adapted them that one derives from the other
a benefit or advantage of an *obvious, continuous and reasona-
bly necessary* character, and he sells one of them, or the her-
itages any otherwise come to the possession of different
owners, without its being expressly provided whether such
benefit or advantage shall continue to subsist as between the.
heritages or parts of the heritage, or not, there is in the si-

lence of the parties an *implication*, in the nature of an un-
·derstanding and agreement, that these advantages and bur-
dens, respectively, shall continue as before the separation of
the title.   But in order to give this effect, it is required that
the servitude or easement should be *reasonably necessary*, as
well  as  *continuous  and  obvious*, or  at all events *made
known* to the new acquirer of  the  property  in  which it is
claimed.   Wash.  on  Easements,  chapter  1, section  3, pp.
54-7, 88-9, *Nicholas* v.  *Chamberlain*, 3 Cro. (Jac.) 121; *Lamp-
man* v.  *Mills*, 21 N. Y. 545; *Elliott* v. *Rhett*, 5 Richards (S.
C.) 405;  *Scott* v. *Bentel*, 23 Grat. 6; *Hardy* v. *McCullough*,
*Id*. 258; *Sanderlin* v. *Baxter*, 76 Va. 304.   *  *  *  The
reason upon which this doctrine rests of an implied grant of
apparent, continuous and necessary easements, on the trans-
fer of one of two tracts  or parts of a tract, is said to be found
in the maxim that when a thing is  granted everything neces-
sary to the enjoyment thereof, which is in the grantor's gift,
is also presumed to be granted."

In the case of *Elliott* v. *Rhett*, *supra*, it was held: "Grant
of continuous and apparent easements  is  implied  on  sever-
ance of heritage where, though having  no legal existence as
easements, they have  in fact been used by the owner during
the unity of the heritage, or where they are necessary to the
full  enjoyment  of  the  several  portions  of  the  heritage.
Grant of right of drainage is implied on  severance of heri-
tage by a  conveyance of part, in favor of the part conveyed,
as against the residue, where such  right has been continu-
ously exercised by the owner of the entire tract, and there is
no natural drainage."

"If  the owner of an  estate, part of which is  *quasi* domi-
nant and part *quasi* servient, aliens the two  portions to dif-
ferent persons, the respective alienees will take  the portions
granted to them burdened or benfited, as the case may be, by
those rights in the nature of apparent  and continuous ease-
ments which the previous owner had the  right to attach to
them."    10 Am. & Eng. Enc. Law, p. 425.

"Upon  the  principle  of  construction that  where  a
man grants a  thing he  grants with  it everything necessary
to its enjoyment, it is held that  by grant of land easements
necessary  for  its enjoyment  are created *ex  necessitate* and
pass by the grant, although not expressly named."    14 Cyc.
1166.

In the case of *Paine* v. *Chandler*, 19 L. R. A. 99 (N. Y.), it was held: "The necessity required in order to pass an easement by implication is a reasonable, not an absolute one. Mere convenience is not sufficient to create or convey an easement by implication, but the privilege or right must be of value to the estate granted which the grantee has estimated as an advantage to the estate and paid for in his purchase.

"Interrupting the flow of water to a spring on one's own land by digging a well and ditches thereon constitutes an unlawful diversion of the water from the spring where an implied grant of the use of the waters of the spring has been made to the grantee of an adjoining farm." See also *Johnstown Cheese M'fg. Co.* v. *Veghte*, 69 N. Y. 16.

In the case of *Burwell* v. *Hobson*, *supra*, which is binding authority upon this Court, it was held as follows: "H., owning lands on both sides of creek which frequently overflowed its banks, built a dike along the south side of it, to protect his low grounds on that side of the creek; and this caused the creek to overflow the land on the north side still more. At his death, his lands were divided by commissioners, who allotted to one of his children the land on the south side of the creek, and to another, W., the land on the north side; and in their report they made no allusion to the dike. The son receiving the land on the south side of the creek, afterward sold it to B.; and then W., owning the land on the north side, commenced to build a dike on that side, to protect his lands, which would have the effect to destroy the dike built by H., and overflow the low grounds on the south side. B. then filed a bill to enjoin the building of the dike on the north sike. *Held*: B. is entitled to have his dike as it was when H. died, and to have his lands protected thereby; and W. has no right to build a dike on his side of the creek which would destroy the dike of B., and overflow his low grounds. Equity will interfere to prevent the building of the dike, and will compel W. to abate so much of his dike already built as would injure the dike and low grounds of B." In the course of the opinion of the court in that case, delivered by Judge Moncure, he says: "If the intestate had conveyed the land

with the dike thereon to the appellant, the latter would have been entitled to the benefit of the dike, and the intestate could not have deprived him thereof by erecting his dike on the other side. If the heirs had divided the land among themselves by mutual agreement, and interchanged deeds for the lot of each, the deed conveying the lot with the dike thereon would have entitled the grantee to the benefit of the dike, and he could not have been deprived thereof by the act of any of the other heirs. There is no difference in this respect between a partition by suit and a partition by mutual agreement and interchange of deeds. In each case the heirs are in effect purchasers of the respective lots, and entitled to hold as any other purchaser would be."

The doctrine of *quasi* easements applies with peculiar force in partition. "A right by implication may sometimes arise in the case of a partition among heirs when it would not arise in the case of a conveyance of part of a heritage to a stranger." 14 Cyc. 1167. In *Brakely* v. *Sharp*, 10 N. J. Eq. 206, the intestate owned two farms at his death, with a house on each, and had constructed an aqueduct from a spring upon one of them to both these houses. Upon his death, the farm upon which was the spring was set apart to the widow and one heir, and the other farm to the other heir. The question arose as to the effect of this partition upon the right which the owner of the second farm had to those in connection with his house, in the benefit of this acqueduct. The Chancellor held that if the ancestor, while owning both farms, had conveyed to a stranger the one which was set apart to the widow, he would have lost all benefit of the aqueduct as an easement if he had not expressly reserved it in his deed; but the widow and heirs would not stand in the light of purchasers from the ancestor. All the heirs came in with equal rights, and no preference arose from mere priority of assignment. See *Collins* v. *Prentice*, 15 Conn. 39; *Kilgour* v. *Ashcom*, 5 Harr. & J. 82; *Seymour* v. *Lewis*, 13 N. J. Eq. 439; *Elliott* v. *Sallee*, 14 Ohio St. 10; and *Goodall* v. *Godfrey*, 53 Vt. 219.

We have in this case not alone the fact that there was a partition by simultaneous grants; but we have for consideration the provisions of the deed.

In the part of the deed whereby Gertrude O. and Sallie Bartlett were conveyed their share of land occurs this language: "But there is reserved to the lands hereinafter mentioned and conveyed to Fannie M. Gould, the free use and access to the said spring lot and spring, for stock, farm uses, and all domestic purposes, but so as not to interfere with the protection of said spring, and its flow to the ice ponds on the west side." In the part of the deed whereby Mrs. Gould was conveyed her share of the land occurs this language: "Also the free use and access to the spring lot and spring, for stock, farm uses, and all domestic purposes, as aforesaid." These provisions, taken together, mean that Mrs. Gould for her land is entitled to the free use and access to the spring lot and spring, for stock, farm uses and all domestic purposes, but so as not to interfere with the protection of the spring, and its flow to the ice ponds on the land conveyed to Gertrude O. and Sallie Bartlett.

What bearing do these provisions have on the question of easement? Certainly they contain nothing which could be construed as working a discontinuance of the *quasi* easement. Mrs. Gould was granted the free use of and access to the spring lot and spring, but so as not to interfere with the protection of the spring, or its flow to the ice ponds. By the deed, the use in common of the spring was continued in the owners of the two parts of the farm, limited in extent, so far as Mrs. Gould was concerned, to the purposes specified in the deed; but absolute in the owners of the spring lot, subject to access and use by the owner of the Gould land. By the deed, the continued existence, and not the destruction, of the spring was contemplated and intended. Its continued existence was contemplated not only for the purpose of flow to the ice ponds, but also for the use of Mrs. Gould for her land as therein specified. The effect of the provisions of the deed was to continue conditions as to the use of the spring practically as they existed when the deed was made.

In the subsequent partition suit of Gertrude O. Bartlett against Mrs. Gould and others, the commissioners reported that "all the parties to whom allotments and partitions have been made of the home farm, shall at all times have

the free use and access to the 'spring lot' and spring aforesaid, to obtain water for stock, farm uses, and all domestic purposes, but so as not to interfere with the protection of the said spring, and its flow to the ice ponds on the west side of the public road." This report was carried into effect by decree. If this is material at all it is simply a further provision for a continuance of previous conditions. The owners of all parts of this farm had enjoyed the use of the spring. The spring could not continue to exist without its supply of water. To cut off its supply would be to discontinue the spring. We are clearly of the opinion that Mrs. Johnson for her land has the right to the water naturally issuing or flowing from the land of Mrs. Gould, for the purpose of supplying the spring, in the condition in which the land of Mrs. Gould was at the time of the partition, except to the extent that such condition had been changed by natural causes. Such right of Mrs. Johnson constitutes an easement, in favor of her land, upon the land of Mrs. Gould. Mrs. Gould, then, has no right to so change the physical condition of her land as to materially and permanently interfere with or destroy the easement. By the excavations for the new spring on the land of Mrs. Gould, and by the tunnel or ditch and other constructions, she has materially and permanently interfered with and impaired, if not practically cut off, the supply of water to which Mrs. Johnson is entitled for her spring. This interference with the easement is of a continuing, permanent and material character. In such case, equity has jurisdiction, by injunction, to prevent such interference. Jones on Easm. section 880-81; High on Inj. 878; *Pence v. Carney*, 58 W. Va. 296. It may be contended that the easement can not exist in favor of Mrs. Johnson, who owns, as devisee of Sallie Bartlett, the land upon which the ice ponds and old spring are located. This position is not tenable. The easemant is appurtenant to the land now owned by Mrs. Johnson. She stands in the same situation as would Sallie Bartlett, if living, and is entitled to the same benefit of the easement. *Burwell* v. *Hobson, supra; Linkenhoker* v. *Graybill*, 80 Va. 835; 14 Cyc. 1166; Jones on Eas. section 18.

The decree of the lower court in this cause protects the easement to which Mrs. Johnson is entitled, to a limited ex-

tent only. The decree provides that Mrs. Gould "shall, within 30 days from the rise of this Court, by a proper construction, such as will raise the flow of water from the spring on her said lot one foot at the point where the water from said spring flows into the public road at or near the building known as 'Springdale Springs,' raise the water in her spring one foot, so as to, if such construction will do so, restore the flow of water to the spring on the spring lot known as the old spring." This decree is not the full measure of relief to which Mrs. Johnson is entitled. She is entitled to an injunction against the maintenance by Mrs. Gould of the new spring, the tunnel or ditch, and all other constructions made by her, in so far only as the same materially interfere with, impair or destroy the easement to which Mrs. Johnson is entitled for her land. Mrs. Johnson under the circumstances of this case is also entitled to have the land of Mrs. Gould restored to the condition in which it was at the time of the partition, if that can be done, (except where such condition has been changed by natural causes,) so far as necessary to restore the natural issuance or flow of water therefrom supplying the old spring. Jones on Eas. section 890.

For the reasons stated, the decree of the circuit court must he reversed, and this cause remanded with directions to enter such decree or decrees as shall be necessary to carry into effect the principles announced in this opinion, and to be further proceeded with according to the rules governing courts of equity.

*Reversed.*