WONG LEONG, CHING SUI, YIM QUON, SAM SING WAI COMPANY, KANEOHE RANCH COMPANY, Limited, KAULA (w) and KALIKO KELLY (w) *v.* W. G. IRWIN.

APPEAL FROM COMMISSIONER OF WATER RIGHTS, DISTRICT OF KOOLAUPOKO.

SUBMITTED NOVEMBER 15, 1895.        DECIDED APRIL 25, 1896.

JUDD, C.J., FREAR AND WHITING, JJ.

In proceedings by lower proprietors to enjoin an upper proprietor from diverting water from various streams in an Ahupuaa, held:

(1) That the evidence is sufficient to show that the defendant does not divert more water than he is entitled by prescription to use on his uncultivated taro lands.

(2) That, since all the streams from which defendant is entitled to take water for these lands unite before leaving his lands, it is immaterial to the lower proprietors from which of the streams the water is diverted.

(3) That under the circumstances the plaintiffs have no rights in the seepage water from defendant's taro lands.

(4) That the water might lawfully be diverted from one Ahupuaa to another Ahupuaa.

### OPINION OF THE COURT BY FREAR, J.

The defendant holds in fee or under lease, with the exception of certain kuleanas and perhaps certain konohiki taro lands, the various lands comprised in the great basin or amphitheater that forms the upper or southerly portion of the Ahupuaa of Kailua, in the District of Koolaupoko, on the northeasterly or windward side of the Island of Oahu. On these lands many small streams take their rise, and, augmented by springs along their courses and uniting at various points with each other, all finally become one large stream at a point near the center of the lower or northerly boundary of this basin. Thence the stream, further increased along its course by other springs as well as by other small streams from other portions of the Ahupuaa of Kailua, flows northerly through the ahupuaa along some of plaintiff's taro and rice lands, which it irrigates, and their two rice mills, which it runs, and empties into a large pond known as Kawainui, from which the water flows easterly through other rice and taro lands of the plaintiffs, and then, joined by the stream from Kaelepulu pond, also in this Ahupuaa, flows northerly and empties into the ocean.

The defendant recently constructed an aqueduct consisting of ditches and flumes, extending several miles from west to east across the upper portion of some of the lands held by him (Maunawili, Ainoni and Makawao), and a tunnel through the ridge which separates the Ahupuaa of Kailua from the adjoining Ahupuaa of Waimanalo, and by means thereof diverts, whenever needed, a portion of the water which formerly flowed in five of the small streams on these lands from points at or near their sources (the springs known as Kapikuakea and Kailiili in Maunawili, Kapuoou and Kupee in Makawao, and the Ainoni spring), and conducts this water into Waimanalo, where it is used to irrigate the cane lands of the Waimanalo Sugar Company.

The plaintiffs brought suit before the Water Commissioner of Koolaupoko to enjoin the defendant from thus diverting this

water, and the case comes here on their appeal from the refusal of the Commissioner to enjoin such diversion.

The defense mainly relied upon is that no more water is diverted than the defendant is entitled by prescription to use upon his now uncultivated taro lands in Kailua, and that the diversion is not injurious to the plaintiffs.

It appears from the maps (Exhibits A, B, D, E, F, H) and title deeds on file, and the testimony of Mr. Wall, the surveyor, that the defendant owns in fee 55.70 acres of taro land not now under cultivation, namely 7.67 acres in Puukaea, 7.49 in Makawao, 6.99 in the westerly half of Ainoni, 20.21 in Maunawili, 10.63 in Kaimi, and 2.71 in lands below the Maunawili ranch house.

Unfortunately the conditions are such as to render it practically impossible to ascertain by measurement the quantity of water to which the defendant is entitled as owner of these taro lands. Hence recourse was had to the testimony of witnesses as to the relative and actual amounts of water required by cane and taro respectively in other parts of these islands.

Witnesses acquainted with the relative amounts of water required by cane and taro on neighboring lands, and who had transferred water from taro to cane lands, testified that taro requires from three to ten times as much water as cane, the difference in the ratio depending upon whether the taro land is tamped or not, and upon whether it is entitled to a constant or only a periodic supply of water, as well as upon differences of soil, temperature, wind, rainfall and other conditions. Taking the ratio least favorable to the defendant, the water appurtenant to his 55.70 acres of uncultivated taro land should be sufficient for three times that area of cane land, or 167.10 acres.

Again, witnesses familiar with taro cultivation testified that taro requires from eight to twelve inches of water a week; and witnesses familiar with cane cultivation testified that cane requires about three inches of water at a time, three or four times a month. Taking also from these figures those least favorable to the defendant—that is, three inches of water a week for cane

and eight for taro—substantially the same result is obtained, that taro requires about three times as much water as cane.

Mr. Chalmers, the manager of the Waimanalo Sugar Plantation, testified that the water diverted would irrigate from 100 to 125 acres of cane. If so, the water diverted is, according to the above estimates, somewhat less in amount than the defendant is entitled to use upon his uncultivated taro lands. But this testimony is not altogether satisfactory. The water diverted is not confined to any particular tract of land, but is used indiscriminately with other water upon various fields, and it appears from other testimony of the same witness that far more than 125 acres (perhaps 300 acres) of land is now cultivated in cane because of this accession to the water supply, which would not otherwise be cultivated. The explanation of his testimony as a whole would seem to be that in dry seasons, or if there were but little rain throughout the year, the water diverted would properly irrigate from 100 to 125 acres of cane, but that, perhaps chiefly on account of the abundance of rain in that district, more cane land can be cultivated there than in most other districts with a given amount of water for irrigation, because during a large part of the year but little irrigation (about twice a month) is required, and a comparatively small amount of water can sustain the cane without serious loss through the short dry season, although it could not properly irrigate the same area throughout the year.

Let us, therefore, consider another and more definite and more satisfactory line of investigation. Although the water sufficient for the taro land cannot be measured, that which is diverted can be and has been measured. At a time when the water was high, six inches deep in the flume, Mr. Boyd, a surveyor, found a flow of 1,462,485 gallons in twenty-four hours. Mr. Chalmers testified that it varied from a million to a million and a half gallons a day. The maximum amount, 1,500,000 gallons a day, would cover about 128 acres of cane land three inches deep once a week. This tends to confirm Mr. Chalmers' testimony as to the area that could be properly irrigated with the

diverted water if the land depended wholly or chiefly on irrigation. This quantity of water would also cover 55.70 acres of taro land a little less than seven inches deep once a week; that is, seven-eighths of the minimum depth testified to as required by taro lands in various localities and under various conditions.

The particular circumstances in this case would seem to strengthen rather than weaken the force of the conclusions arrived at by the foregoing methods of estimation. It was shown that, by prescriptive right, the taro lands in question need not be tamped, and are entitled to a constant flow of water; that such lands require and are entitled to considerably more water than lands that must be tamped and that have water at stated periods only; that the porosity of the soil and prevalence of winds in this part of Kailua are such as to indicate that the loss of water by seepage and evaporation is probably not less there than in most other parts of these islands; that the cane lands at Waimanalo do not require more water than other cane lands which require irrigation; in fact that cane is irrigated at Waimanalo only about once in two weeks, while in many places it is irrigated oftener—in some places once a week. This is due no doubt chiefly to the fact that Waimanalo is on the windward side of the island, where the rainfall is greater than on the leeward sides of the islands, where irrigation is more frequent. Yet for this reason the taro lands also would require less water by way of irrigation than would be required by similar lands in more arid localities. But the greater the rainfall the less proportionately would be the amount of water required by way of irrigation in the case of cane lands than in the case of taro lands, because of the smaller area of taro land requiring a given amount of water or the greater amount of water required for a given area.

All things considered, therefore, and giving the plaintiffs the benefit of uncertainties, we are of the opinion that the defendant does not divert more water than he is entitled to use upon his uncultivated taro lands.

It is further contended for the plaintiffs that it is unlawful

for the defendant to divert, as he now does, from five streams on three lands, the quantity of water that he is entitled to from a larger number of streams on a larger number of lands. But, since all the streams in question unite before leaving his lands, and all the plaintiffs' lands entitled to water are situated below his lands, it is immaterial to them from what stream or streams the water is diverted.

It is also contended that the natural drainage from the taro lands is down the valley, and that by the diversion the plaintiffs are deprived of the seepage that would otherwise reappear at lower points in springs. The topography of Kailua is such that surface water would naturally flow from defendant's towards plaintiffs' lands, but it is entirely uncertain what direction the water would take after leaving the surface. It is not shown that the seepage in defendant's taro lands would take the course of surface waters, or, if it should, that it would reappear in the lower springs, much less that it would flow underground in known and well defined channels. Subterranean waters, to be the subject of rights, must, like surface waters, in general flow in known and well defined channels. Gould on Waters, 2d Ed., Secs. 280, 281, citing *Davis v. Afong,* 5 Haw. 216, and numerous other cases. Nor could a prescriptive right be acquired to mere drainage water under these circumstances, whether on the surface or underground. *Peck v. Bailey,* 8 Haw. 658. At most this would be only a case of *damnum absque injuria.*

Finally, it is contended that the water cannot be lawfully transferred from one ahupuaa to another—either by common law or by ancient Hawaiian usage. So far as the argument rests upon the common law, it is based on the doctrine of riparian rights, which has no application to the rights now in question, which are prescriptive rights. Riparian rights are naturally rights depending on the ownership of land situated on the bank (ripa) of a stream. Except for certain natural and ordinary purposes, the rights of one proprietor are not in general superior to those of another. The rights of all for purposes of irrigation or other so-called extraordinary purposes are based on the prin-

ciple of equality and are correlative and inter-dependent. Each may take only such an amount of water as is reasonable under all the circumstances. If one takes more than this amount under a claim of right, although no damage might for the time being be caused thereby to the others, because they do not choose to exercise their full rights, yet it would be an injury (*injuria sine damno*) for which they could maintain an action, because otherwise the wrongful user might by long continuance ripen into a right. When once it has thus ripened into a right it becomes a superior and absolute right, no longer depending upon the location of the land upon the banks of the stream or upon the corresponding rights of others. It may then be utilized in any manner, in any place, for any purpose, so long as no injury is caused thereby to others. The case is somewhat analogous to that of joint tenants of a tract of land. Each may use the common property to a reasonable extent, all things considered, but if one exceeds his rights, as for instance by occupying one portion adversely, the others might well complain, even though they should not care to occupy the land themselves for the time being, for the adverse occupancy might ripen into a right. If once it should thus ripen into a right, it would become a superior, exclusive and absolute right, and the occupier might then use his portion in any way he might please, so long as he did not interfere with the rights of the others in the remaining portion. For their rights in the portion occupied by him would be extinguished. In such case the other proprietors would have no more concern with his rights in his portion than outside third parties would have.

So far as the argument rests upon Hawaiian usage, it is based on the statement that such transfers were not made in ancient times. But this is quite different from a statement that such transfers could not be made. So far as they were not made, it was no doubt in most instances because there was no occasion or means for making them, as there is now, with the changed conditions of population and society, the diversification and extension of agricultural industries and the possession of capital

and engineering skill and appliances. But we do not know as a fact that such transfers were never made in ancient times. We do know that in some instances there were several ahupuaas in the same natural water system, all receiving water from the same stream. In this very case several of the defendant's lands are ahupuaas, if the testimoney of plaintffs' witnesses is correct, and yet all belong to the same water system. This is true also of the Kauaula water system at Lahaina, Maui, and in the case of *Pioneer Mill v. Kumuliilii*, *ante*, 174, this court held that, although by ancient custom each of the numerous ahupuaas in that system was entitled by prescription to water only once in eleven days, yet that the water might be transferred by a kuleana holder in one ahupuaa on his water day to a kuleana on a different ahupuaa which had a different water day, provided the rights of others were not injuriously affected thereby. There is no difference in principle between a transfer from one place to another in the same ahupuaa and a transfer from one ahupuaa to another.

In view of the foregoing it will be unnecessary to consider the question of the application of the doctrine of riparian rights to the conditions existing in Kailua, or in these lands generally, or the interesting arguments and evidence adduced in this case on the supposition that the court might find it necessary to pass upon this question.

A decree will be signed in accordance with these views, all costs to be divided.

*A. S. Hartwell*, for plaintiffs Wong Leong, Ching Sui, Yim Quon and Sam Sing Wai Company.

*C. Brown*, for plaintiffs Kaneohe Ranch Company, Limited, Kaula and Kaliko Kelly.

*W. A. Kinney*, for defendant.