CITY MILL COMPANY, LIMITED, *v.* HONOLULU SEWER AND WATER COMMISSION, G. STANLEY McKENZIE, FRED T. WILLIAMS, GEORGE F. WRIGHT, C. CAMPBELL CROZIER, LYMAN H. BIGELOW, COMMISSIONERS.

No. 1847.

Argued February 26, 1929.　　　Decided March 25, 1929.

Perry, C. J., Banks and Parsons, JJ.

OPINION OF THE COURT BY PERRY, C. J.

By Act 150, L. 1925, the legislature created a commission, to be known as the Honolulu sewer and water commission, consisting of five citizens of the Territory and residents of Honolulu, to be appointed by the governor in accordance with section 80 of the Organic Act. The commission was created for the purpose of planning and constructing an adequate sewer and water system for the district of Honolulu and was given certain subsidiary powers not material to be here considered. By Act 222, L. 1927, certain additional powers were conferred upon the commission. The title of the latter Act is: "An Act to provide for an investigation and report by the Honolulu sewer and water commission upon the water resources available for the district of Honolulu, with recommendations for legislation to provide for their proper conservation, development, use and control, and further providing for the immediate control and regula-

tion of new, or reopening of old, artesian wells in the district of Honolulu." In a preamble to the Act it is said: "Whereas, in the report submitted to the legislature of the Territory of Hawaii at its fourteenth regular session by the Honolulu sewer and water commission, pursuant to the terms of Act 150 of the Session Laws of 1925, it is represented to the legislature that the water resources within the district of Honolulu, on the Island of Oahu, are limited, and do not increase with the growth of population or the enlargement of the requirements for water therein; that unless the same are carefully conserved and economically administered they will soon become inadequate for the public needs; and that the health and general welfare of the public will require that the manner and extent of the development, conservation, use and control of the water resources of said district should be determined and regulated by governmental authority as soon as practicable." In section 1 it is provided that the commission "is hereby vested with full power and authority to survey and investigate the location and sources of supply of water within the district of Honolulu, both surface and underground, and any surface waters outside of said district in said island, and to determine or estimate the amounts available for use and the maximum productivity of such sources thereof." Section 2 makes it a duty of the commission to study and compile records and estimates of "water required for present and reasonably prospective uses" in Honolulu and to devise and recommend to the legislature "prospective ways and means by which such uses may be coordinated and served with a maximum conservation, storage, distribution and application of all waters of said district" and "to estimate the cost of the necessary works for carrying out such objects." Under section 3 all owners and users of artesian wells in the district

of Honolulu are required to furnish to the commission all data desired by it relating to the location and use of artesian wells. Section 4 provides that "any person owning an artesian well in said district may relieve himself of further liability therefor * * * by granting to the City and County of Honolulu the right to permanently seal said well." Section 5 reads as follows: "Permit for new wells. From and after the passage of this Act, it shall be unlawful for any person to sink, bore, drill or drive any new artesian well in said district of Honolulu, or to reopen any artesian well which has been unused for two years or more, except under and pursuant to the terms and conditions of a permit therefor from the commission. Application for such permit shall be made to the commission, in writing, signed and verified by the party intending to operate under same, setting forth the name and post office address of the applicant, a description of the location of the well proposed to be bored or reopened (which location shall thereafter be exactly marked upon the ground, if so requested by the commission), the nature and extent of the proposed use of the water, and shall be accompanied by the specifications for the proposed work, including the casing, capping, equipping and means of control and operation of such well. If, in the opinion of the commission, the proposed work would threaten the safety of the water of the artesian area or basin which would be drawn upon by such well, by lowering its level or increasing the salt content of any existing well or wells, the application therefor may be denied. The commission may charge a fee of one hundred dollars ($100.00) for any permit issued hereunder. All such fees shall be deposited by the commission with the treasurer of the City and County of Honolulu and are hereby appropriated for the use of the commission." Section 6 provides that "as a condition precedent

to granting any permit" to sink or reopen any artesian well, the applicant may be required to sign an agreement to perform the work in the manner prescribed by the commission and thereafter to operate and maintain the well in accordance with the provisions of the Act and under such rules and regulations as the commission may from time to time promulgate. It also authorizes the commission to require of the applicant a bond or other form of indemnity to insure compliance with its orders and rules. In the event of failure on the part of the owner to comply with the orders of the commission relating to the sinking, reopening or maintenance of a well, the commission is given power "either to seal such well at the cost of such bond, or do such work as may be necessary to put the same in proper condition at like cost." Under section 7 the commission is authorized, for cause satisfactory to it, and after notice and hearing, to suspend or revoke any permit for the opening of a well. Under section 8 the commission is given power to investigate all the uses of water within the district and any machinery or equipment used for the transmission or distribution of water and to ascertain all manner of details relating to artesian wells and the strata through which they pass; is authorized "to prescribe and regulate the manner in which new artesian wells in said district may be bored, drilled or driven, encased, capped, or unused wells reopened, controlled and operated, including methods and materials of construction and means of control; and to install or require the installation of measuring devices of water from any such well, and provide for the maintenance and protection of such devices;" also power to enter upon any property, public or private, at any reasonable time, without warrant, in order to exercise any of the other powers given by the Act; to "subpoena and compel the attendance of witnesses

to any investigation or proceeding before the commission" and to compel "the production of books, papers and other evidence; * * * to administer oaths and examine witnesses under oath;" and to punish for contempt. Section 9 authorizes the commission, subject to the approval of the governor, to make, alter and repeal "such rules and regulations, not inconsistent with law, as it may deem necessary for the furtherance of any of the purposes of this Act or the appropriate exercise of any of its powers." Section 10 reads as follows: "Appeal to supreme court. Any order of the commission refusing any permit or suspending or revoking any permit theretofore granted, shall be subject to an appeal therefrom directly to the supreme court of the Territory, which appeals shall be governed by the practice in suits in equity. Said appellate court shall have power to review and to affirm, modify or reverse any decision or order of the commission so appealed from, in any matter of law or fact. Such appeal shall be taken within ten days after service of the commission's order complained of, by filing notice of appeal with the clerk of said appellate court and serving a copy thereof upon the commission, stating the grounds therefor." Section 11 provides penalties for the violation of any provision of the Act or of any rule or regulation of the commission. Section 16 reads as follows: "Effect of partial invalidity. If any section, subsection, sentence, clause or phrase of this Act shall, for any reason, be held to be unconstitutional, such decision shall not affect the validity of the remaining portion of this Act. The legislature hereby declares that it would have passed each section, subsection, sentence, clause and phrase of this Act, irrespective of the fact that any one or more other sections, subsections, sentences, clauses or phrases might be declared unconstitutional." Section 17 reads as follows: "Said commission is further authorized and directed to

report to the legislature of the Territory of Hawaii at its next regular session, upon its work pursuant to this Act, with the recommendations of said commission for such legislation as may be deemed necessary to provide for the systematic and economical development, conservation, use and control, by any lawful means, of the water resources available for said district for their greatest use and the largest public benefit."

In pursuance of the provisions of this statute the City Mill Company, Limited, an Hawaiian corporation, filed a petition with the Honolulu sewer and water commission for a permit to drill a new artesian well upon property owned by it near the corner of Liliha and Kukui streets in the city of Honolulu. The essential allegations of the petition were in brief as follows: "That the water from the proposed well is intended to be used for domestic purposes only for supplying water to ten one-story cottages, three one-story double cottages, three two-story buildings comprising sixteen stores on the ground floor and sixteen rooms on the second floor, two two-story apartment and store buildings comprising fifteen apartments and five stores, all located on Kukui street near the proposed well and belonging to the applicant;" that the "water will be used to the extent of approximately 1,221,000 gallons per month, this being the amount now supplied to said buildings from the city mains;" that "the applicant is willing to pay all fees required and to comply with all reasonable conditions that the commission may require relating to the drilling of the proposed well and thereafter is willing to operate and maintain control of such well under such rules and regulations of the commission as from time to time may be in force and to give a bond or other form of indemnity satisfactory to the commission to insure compliance with such provisions, rules and regulations;" that the well is to be "cased with

8″ wrought iron steam pipe on the top section and with 6″ wrought iron steam pipe in the lower section, casing to extend to the cap-rock and to be imbedded in the cap in such a way as to prevent leakage;" is "to be fitted with an 8″ cast iron tee at the top and a plug screwed in with a valve leading out from the side to control the water;" and is to "be operated by an automatic electric pump to pump the water into tanks sufficiently high to supply the buildings referred to." Upon receipt of the application it was referred by the commission to its chief engineer for a report thereon. The chief engineer recommended that the application be denied for the following reasons: "1. That the draft on the Honolulu artesian basin or basins is now larger than the supply or infiltration. 2. That the salt content of the artesian wells near this proposed location is high already, and that the water from a well in this location would, within a few years, become too salty for domestic use, resulting in the abandonment of the well and the necessity of sealing soon. 3. That the applicant gives no assurance, and we believe he cannot give this assurance, that the draft on this well will not ever be more than the present requirement. 4. That this property is now serviced from the city water supply. 5. That a large portion of the water required for this applicant's property is being wasted." 6. That Act 222, L. 1927, gives the commission authority to grant or to deny permits for the drilling of new artesian wells, quoting in this respect certain portions of the statute. 7. That "graphs of the artesian head both for the central Honolulu artesian basin from McCully street to Nuuanu stream from 1900 to 1928, and for the basin from Nuuanu stream to Kalihi stream from 1910 to 1928, show that there has been a decided general drop in the head;" that "this means that the draft from the basins has been and still is greater than the supply or infiltration to the basins;"

that "any additional draft from private wells should not be permitted." 8. That the commission's charts, prepared in 1926, "show definitely a steady inland movement of salt content in artesian water;" and, 9. that "a new well in the proposed location will probably be between 800 and 1000 feet deep, which, from the history of the gradual creeping in of the salt content and Dr. Palmer's report, means that the well either would be salty when drilled or would become salty in a few years;" that "its use for potable water" would be "prevented and then be abandoned" and that "after that it would either be sealed at an expense to the city or the commission or become a menace to the artesian supply." The engineer added that "any new private well will be a potential possibility toward increased draft from the artesian basin and should not be permitted" and that should the permit be granted he would recommend "several changes in the applicant's specifications in his application" referring to "the manner of imbedding casing in the cap-rock, the kind of casing, the elimination of the two sizes of casing, the placing of a valve directly on top of the well casing before other fittings and the inclusion of a meter."

At a hearing had before the commission the applicant reiterated its willingness to comply with any changes in the specifications that might be prescribed by the commission and with all rules and regulations of the commission relating to the operation of the well. The chief engineer was not cross-examined at the hearing. Only one witness, an expert on artesian wells who had drilled almost all of the wells on this island, was called by the applicant and was examined and cross-examined. In addition to the engineer's report and this testimony, no other evidence was adduced. At the conclusion of the hearing the secretary moved "that the commission go on record as denying the application of the City Mill

Co., Ltd. to drill a well in the district of Honolulu, being against the policy of the sewer and water commission, which is the intent of Act 222, S. L. 1927." The motion carried and the application was denied. From the ruling of the commission the applicant appealed to this court.

It is obvious from the record before us that the application was denied, not because the specifications offered by the applicant for the drilling and maintenance of the well were unsatisfactory to the commission, but because the commission believed that from the artesian basin which the proposed well would tap more water is already being drawn by existing artesian wells than is filtering into the basin by natural processes and that the opening and use of a new well would tend to further deplete the artesian supply and to threaten such an increase, in a few years, of the salt content of all of the artesian waters of the basin involved as to make them non-potable.

At this point it may be well to say that the present generally accepted theory, with reference to artesian waters, is that they have their origin in rain and streams and melting snow and ice (where these exist), and thence pass through the soil or other materials of the earth's surface and through crevices and other openings in the rocks to a pervious stratum of broken rock or other loose material full of interstices, usually at a considerable depth below the surface, which pervious stratum lies between two impervious strata, one above and one below, and is blocked in at the seaward end with a wall of impervious material, the pervious stratum being sufficiently tilted upward at the end which receives the infiltrations so as to prevent an escape of the waters at that end. The drilling of a hole through the upper impervious stratum to the water-bearing rock or other material permits the water otherwise held down to flow in the well to the highest level which the confined artesian body attains

at the end of intake. At the point of exit the water sometimes flows by nature over the end of the pipe above the surface of the earth and sometimes not quite to the surface of the earth.

The question now before us is, not whether or to what extent the Territory or its agent the sewer and water commission may regulate the boring or the operation and maintenance of artesian wells, but whether it may, without compensation to the applicants, prohibit the boring of any new well while at the same time leaving all users of existing wells at liberty to draw water therefrom. The question is entirely a new one in this Territory, never having received judicial consideration or adjudication, and its decision, whatever it may be, cannot fail to be of very great importance to the Territory, the City and County of Honolulu and individual owners of land. It can be answered only by considering what are the rights of the parties.

Three doctrines have been advanced by courts and text writers which bear more or less directly on this subject. One referred to in the argument of this case and in some of the books as "the common-law doctrine" is that an individual owner of a piece of land, who has the good fortune to sink successfully an artesian well on his land, is the absolute owner of all of the water that naturally flows from the well or that can be drawn therefrom by any pump, however powerful, and that he may use the water as he pleases and may conduct it to supply lands and communities at any distance from his own piece or parcel of land and may even waste it. Another, sometimes called "the reasonable use doctrine," is that an individual owner of land possessing such a well may use all of the waters flowing from the well by nature or obtainable therefrom by pumping, provided the water is used on his own land only, but that he may so use it

either for domestic purposes or for irrigation or for the maintenance of factories or other industrial purposes. Under this rule there is no limit to the quantity of water that may be used, provided it is used on the owner's land. The third is known as "the rule of correlative rights" and is to the effect that all of the owners of lands under which lies an artesian basin have rights to the waters of that basin; that each may use water therefrom as long as he does not injure thereby the rights of others and that in times when there is not sufficient water for all each will be limited to a reasonable share of the water. Under this third rule a diversion of water to lands other than that of origin might, perhaps, be permitted under some circumstances and not under others and certain larger uses, as for industrial purposes, might, perhaps, not be permitted on even the land of origin under some circumstances while being permitted under others. A fourth possibility is that to be found in the claim advanced by the commission in the case at bar and that is that the Territory of Hawaii is the owner, by reason of necessity, of all of the artesian waters underlying the basin in question and, presumably, other basins in this island. A fifth possibility suggests itself for consideration and that is that, conceding that the owners of the land are, either under the first, second or third doctrines, the owners of the artesian waters subjacent thereto, nevertheless the Territory may now, because of a threatened increase in the salt content of the water and a threatened consequent depreciation in quality and non-potability thereof, confiscate all of the artesian waters, that is, take them from the owners for the use of the community in general and without compensation to the original owners.

The so-called "common-law doctrine" seems to us to be unsound. It purports to be based upon the ancient maxim, *"cujus est solum, ejus est usque ad coelum et ad*

*inferos,"* or "he who owns the land is the owner of it, even to the heavens above and to the lowest depths below." From that beginning it proceeds upon the theory that the water found in the land is a part of the land. When applied, however, to an artesian basin and to artesian wells, this view clearly runs counter to the facts. It may, or it may not, be applicable to waters merely oozing in or seeping through soil, but it certainly is not applicable to artesian waters which are known to flow freely and rapidly through broken rock or other materials permitting of easy passage. No artesian basin is ever found, complete in itself, under and within the boundaries of any one person's city lot. They exist usually, and the particular basin under consideration in the case at bar exists, subjacent to large areas of land,—hundreds, and perhaps thousands, of acres. It cannot be said with any regard for the truth that an owner of a city lot or other small portion of the land over an artesian basin who, with a powerful pump takes from his artesian well all of the water that can thus be obtained therefrom, is thus drawing only water which is a part of his own soil or land. The water of the whole basin will unavoidably flow towards its lowest level, that is, where the greatest suction is being applied. To permit an owner of a comparatively small portion of the land to draw water therefrom without limit would be to permit him to take water which clearly was subjacent in a large degree to the property of others.

A much closer approach to adherence to the ancient maxim above quoted, that he who owns a piece of land owns it to the center of the earth, is to regard all of the owners of the land under which an artesian basin lies as owners of the waters of that basin. If a person or other entity should purchase all of a large tract of land under which an artesian basin exists, it would be easy to take the view, we think, that that owner of the land would

be the sole owner of the water underneath it. If two persons or other entities should purchase each a half of that tract it would seem to be equally fair and rational to regard the two owners of the land as owners in equal shares of all of the waters. Why not, upon the same reasoning, regard all the owners of all of the many portions of such an area as co-owners of the waters of the basin? We think that they should be so regarded and that this is the view that most nearly effectuates justice and coincides with early concepts of the law as to the ownership of the soil and all within it. Their rights are correlative. Each should so exercise his right as not to deprive others of their rights in whole or in part. In times of plenty greater freedom of use probably can be permitted and ordinarily would be permitted without question. In times of greater scarcity or of threatened scarcity or deterioration in quality of the waters, all would be required under this view to so conduct themselves in their use of the water as not to take more than their reasonable share.

Some of the earlier American decisions adopted the English rule of absolute ownership. Later cases, however, developed the rule of reasonable use, and many of the latest, with particular reference to artesian wells in the same basin, favor the doctrine of correlative rights. "Although the waters of artesian basins are, in the main, treated as percolations, and under the early common-law rule were considered a part of the soil where found, and belonged to the owner of the soil, there are some important rules under the more modern authorities governing the drawing off and the use of these artesian waters which must be observed. If these waters, like the earth under which they flow or percolate, remained perfectly stationary, and the same were in fact a part and parcel thereof, there would be no question as to the right of the

owner of the land to draw off the water to any extent, to use or to waste it, as he saw fit, as his own individual property, the same as he might take out the mineral, rock, beds of clay or the earth itself. And as long as he drew off only such water as was within his own lines, he could not be prevented from taking out any portion or all of the water within them. But, unfortunately for this rule, water never remains stationary, fixed, or immovable while in the ground. As was said in a recent Minnesota case: 'While water is defined to be a mineral, the rules of law as to its use must logically vary from those applicable to coal, ore, and the like. Water is a fluid, and mobile, "a fugitive." Coal and ores have a fixed and permanent place.' Water is constantly seeking its level, and hence it follows that for a land owner to draw off unlimited quantities of the artesian waters from his lands not only takes the supply from his own lands, but also draws from the lands of his neighbors. His boundary line fences do not extend downward as impervious subterranean dams and thereby keep the underground waters from flowing or percolating from his lands under those of his neighbors, or the waters from the lands of his neighbors from flowing or percolating under his lands. Neither are there imaginary vertical planes drawn from his surface lines downward, as is the case where there is ore, coal, or other solid material in question, to which he may go in their extraction, but no further. But from the very nature of the element and its movements underground when he draws upon his own supply he also draws upon the supply in the lands adjoining his. Hence the early common-law rule, as laid down by the English authorities, and even by some of the American cases, that all underground waters not flowing in defined and known channels belong to the soil, and that the owner of the land may draw them off at pleasure, though in so doing he may entirely drain

such waters from the lands of adjacent or neighboring owners to or from which they would necessarily pass, has, in most jurisdictions in this country, been modified and given way to the more equitable rule of the correlative rights of all the owners of the lands under or through which these waters find their way. And although this rule applies to all percolating waters, except what are known as diffused percolations, it is especially true in the case of the waters of artesian basins, where they flow through all the lands of their respective owners through the same porous strata, and where the tapping of these strata by the means of artesian wells will draw upon the entire supply." 2 Kinney, Irrigation and Water Rights (2d Ed.), §1173.

"The doctrine of the correlative rights to the use of the subterranean or underground waters, whose channels are unknown or undefined, is that doctrine which modifies the common law maxim of *cujus est solum, ejus est usque ad inferos,* or 'he who owns the soil owns it to the lowest depths below,' by the maxim of the civil law of *sic utere tuo ut alienum non laedas,* or, 'so use your own as not to injure another's property.' The *cujus est solum,* etc., doctrine as modified relative to these waters means in effect that, although you may be the owner of the soil and everything in it to the lowest depths, you must so use these subterranean waters found in your own land that the use will not injure the rights or property of another. And although this modified maxim or rule of law applies to other percolating waters than the ones now under discussion, it applies with special force to the waters of artesian basins for the reason that the porous strata wherein these waters are found usually underlie large areas of country, and the tapping of which by artesian wells will draw the waters from the lands of many owners. And, although even the modern authorities are by no

means unanimous in the adoption of this modified rule, we are of the opinion that it is the only just and equitable one. And, therefore, the rule should be applied to all cases where it is known that by the flow of artesian wells naturally overflowing the surface, or the pumping of water in considerable quantities from wells on the lands of one person it draws from or prevents it from percolating to the lands of others, to their injury. And this rule of correlative rights has been adopted as the rule of law governing the waters of artesian basins in many States." *Ib.* §1174.

"It must be noticed that there is a distinction between the English rule as modified by the modern American rule of reasonable use and the rule of correlative rights. Under the rule of reasonable use some of the authorities hold that a land owner has a right to make such a beneficial use of the water found percolating through his land to the extent that may be necessary for the improvement of his land, so long as it is used thereon, although in so doing he may drain the lands of his neighbors. Upon the other hand, the rule of correlative rights to these owners is the rule which abrogates the English rule as to these waters and holds that the rights of all land owners over a common basin, saturated strata, or underground reservoir, are coequal or correlative, and that one land owner can not extract more than his share of the water even for use on his own lands, where the rights of others are injured thereby." *Ib.* §1192.

"Several recent decisions have indicated a tendency on the part of the courts to regard percolating water, so far as it can be shown to be contained in a water-bearing stratum of earth, or in a basin extending underneath the property of several owners, as a great underground lake, which is the common property of the surface owners, and the water from which each has a right to use to satisfy

his own need for any reasonable purpose, but that he cannot make use of it in an unreasonable manner or so as to destroy the rights of those having an equal right in it. The difficulties in the application of this doctrine are not so great as would at first appear, because the water throughout the saturated stratum is so much part of a common body that any excessive drawing of it at one place has an immediate effect in lowering the level throughout the basin, so that there is little difficulty in demonstrating the fact that the one making the excessive use is interfering with the common rights. It has been said that there are no correlative rights existing between proprietors of adjoining lands in reference to the use of water in the earth or percolating under its surface. And many cases have been decided upon this principle. But the attempt to act upon that doctrine very soon forces the conclusion that percolating water is not an exception to the general rule that rights in organized society are not absolute, but correlative, and that one man cannot be permitted to exercise any right if the direct effect of his act will be an injury to his neighbor." 3 Farnham, Waters and Water Rights, 2711, 2712.

"Under the early rule, considered without limitation or qualification, there were no correlative rights between adjoining or neighboring owners of land in underground, percolating waters. Can it then be said in these days of powerful machinery and modern appliances, when it is possible for one land owner to drain the lands of a neighborhood, or section of country, of their underground water and thus render them practically valueless, that underground, percolating waters are wholly without the protection of the law, that they, like the wild animal, belong alone to him who first obtains possession of them? * * * While the early rule, both in England and this country, is as stated above, the weight and trend of the

recent authorities and cases in America are to qualify the early rule by limiting the use by the owner of the land who searches therein and produces percolating water to a reasonable and beneficial use of such water, where to use it otherwise would deprive the owners of adjacent and neighboring lands of the enjoyment of the waters of their lands." *Pence* v. *Carney*, 58 W. Va. 296, 301, 302.

"The principles of natural justice and equity demand the recognition of correlative rights in percolating subterranean waters, so that each landowner may use such water only in a reasonable manner and to a reasonable extent upon his own land and without undue interference with the rights of other landowners to a like use and enjoyment of waters percolating beneath their lands." *Patrick* v. *Smith*, 75 Wash. 407, 415.

"It seems to me that the use of the water by an adjoining owner, to be a reasonable use, especially in an artesian district, should be limited first to his just proportion according to his surface area, and, second, he should not be entitled even to this quantity to the injury of others similarly situated, unless it is reasonably necessary for the beneficial purposes to which he devotes the water.

"In view of the contention usually made by those who insist that the doctrine of correlative rights is inconsistent with the maxim 'cujus est solum, etc.,' I am constrained to make the further observation that the doctrine of correlative rights, in my opinion, is far more consistent with the maxim referred to than is the doctrine that he who owns the soil not only owns the percolating water therein, but also can deprive an adjoining proprietor of a similar right by diverting the water from his land and successfully defend the wrong on the grounds that it is damnum absque injuria. Indeed, it seems to me that the doctrine of correlative rights or reasonable use is the nearest approach that can be made towards a literal

application of the maxim, 'cujus est solum,' etc., as far as underground percolating water is concerned.

"The best-considered modern authorities seem to be overwhelmingly in favor of the doctrine of correlative rights in cases of this kind." *Horne* v. *Utah Oil Refining Co.,* 202 Pac. (Utah) 815, 824.

"The strong trend of the later decisions is toward a qualification of the earlier doctrine that the landowner could exercise unlimited and irresponsible control over subterranean waters on his own land, without regard to the injuries which might thereby result to the lands of other proprietors in the neighborhood. Local conditions, the purpose for which the landowner excavates or drills holes or wells on his land, the use or nonuse intended to be made of the water, and other like circumstances have come to be regarded as more or less influential in this class of cases, and have justly led to an extension of the maxim, *'sic utere tuo ut alienum non laedas,'* to the rights of landowners over subterranean waters, and to some abridgment of their supposed power to injure their neighbors without benefiting themselves." *Gagnon* v. *French Lick Springs Hotel Co.,* 163 Ind. 687, 697, 698.

"As a prelude to this phase of the case, we refer to the conflicting doctrines of the old common law, one to the effect that he who owns the soil owns it to the lowest depth, and the other that he who owns the soil owns the percolating waters therein, and may use the same as he pleases, even though he thereby diverts and appropriates water percolating in the land of an adjacent proprietor. The two doctrines are in hopeless conflict, and utterly incompatible one with the other. This, perhaps, has had more to do than anything else in evolving what is now known as the 'American doctrine'—the doctrine of 'reasonable use.' This doctrine recognizes the correlative rights of adjacent landowners to the underground waters

percolating in and through their respective tracts of land."
*Horne* v. *Utah Oil Refining Co.*, 202 Pac. (Utah) 815,
819, 820.

"The soundness of the English doctrine was, however,
challenged by the supreme court of New Hampshire in a
well-considered case decided in 1862 (*Bassett* v. *Salisbury
Manufacturing Co.*, 43 N. H. 569) * * * where it was
elaborately reasoned that the doctrine of absolute owner-
ship is not well founded in legal principles, and is not
so commended by its practical application as to require
its adoption; that the true rule is that the rights of each
owner being similar, and their enjoyment dependent upon
the action of other landowners, their rights must be cor-
relative and subject to the operation of the maxim *sic
utere,* &c., so that each landowner is restricted to a rea-
sonable exercise of his own rights and a reasonable use
of his own property, in view of the similar rights of
others. * * *

"But it is not too much to say that the rule adopted in
*Chasemore* v. *Richards,* and the reasoning upon which it
was rested, have not withstood the test of time, experience
and ampler discussion, and it is entirely clear that the
strong trend of more recent decisions in this country is
in the direction of a repudiation of the English rule and
the adoption of the doctrine that there are correlative
rights in percolating underground waters; that no land-
owner has the absolute right to withdraw these from
the soil to the detriment of other owners, and is limited
to reasonable uses. * * *

"A review of the reasoning upon which the English
doctrine respecting percolating underground waters rests
will demonstrate, as we think, that this reasoning is
unsatisfactory in itself and inconsistent with legal prin-
ciples otherwise well established. * * *

"The English rule seems to be rested at bottom upon

the maxim, '*cujus est solum, ejus est usque ad coelum et ad inferos.*' * * *

"Here the impracticability of applying the rule of absolute ownership to the fluid, water, which by reason of its nature is incapable of being subjected to such ownership, is apparently overlooked. If the owner of Whiteacre is the absolute proprietor of all the percolating water found beneath the soil, the owner of the neighboring Blackacre must, by the same rule, have the like proprietorship in his own percolating water. How, then, can it be consistent with the declared principle to allow the owner of Whiteacre to withdraw, by pumping or otherwise, not only all the percolating water that is normally subjacent to his own soil, but also, and at the same time, the whole or a part of that which is normally subjacent to Blackacre? Where percolating water exists in a state of nature generally throughout a tract of land, whose parcels are held in several ownership by different proprietors, it is, in the nature of things, impossible to accord to each of these proprietors the absolute right to withdraw *ab libitum* all percolating water which may be reached by a well or pump upon any one of the several lots, for such withdrawal by one owner necessarily interferes to some extent with the enjoyment of the like privilege and opportunity by the other owners." *Meeker* v. *East Orange,* 77 N. J. L 623, 626, 627, 632, 635, 636, 637.

See also *Erickson* v. *Crookston W. P. & L. Co.,* 111 N. W. (Minn.) 391, 392, 394.

The present case is not a controversy between owners of lands within one artesian basin and there is no necessity, therefore, of stating with exactness the precise principles which should govern the admeasurement of the share of each co-owner. Those principles will have to be considered and declared whenever such a question arises. The sole question at present before us is whether

the community as a whole can, without compensation, decree that no further artesian wells shall be dug in the basin in question.

While the Territory of Hawaii, in so far as it may be the owner of any piece or pieces of land over an artesian basin, has the same rights in the artesian waters which a private owner of the same pieces of land would have, no reason occurs to us which would sustain the view that the Territory is, or that its predecessors were, the owners of all artesian waters in the Territory. Prior to 1845 the King was the sole owner, because he was the owner of all of the land in the islands under the system and conceptions then prevailing. When in the late 40's and thereafter the system was voluntarily abandoned by the King and was radically changed and land tenures became vested in individuals, the ownership of the subterranean waters which were a part of the land passed, as a part of the lands themselves, from the King to the individuals. With the issuance of land commission awards, confirmed thereafter by royal patents, the ownership of the King ceased and the ownership of individuals began. In the transaction "all mineral or metallic mines" were reserved to the Hawaiian government, but there was no reservation whatever of the subterranean waters. If the doctrine of correlative rights is the correct one, as we think it is, it has been so since the establishment of titles in individuals and that conception of the law cannot now be altered simply because there is danger, if there is, of the salt content of the artesian basins being increased to the degree that the waters will not be potable. If by the land commission awards and the patents in confirmation thereof the awardees and patentees became the owners of the subjacent waters, courts would not be justified, simply because of the supposed necessity, in announcing such a

radical alteration in their views of the law as is asked in this case on behalf of the commission.

So, also, we are unable to subscribe to the view that in times of peace the Territory, directly or through any agent, can deliberately confiscate the water rights of individuals simply because the community as a whole needs the water, if it does. The Constitution of the United States expressly says, in language which would seem to be unambiguous, that no person shall "be deprived of property without due process of law" and that "private property shall not be taken for public use without just compensation." This constitutional provision covers the case of a pressing need, as well as the case of a lesser, ordinary need. If an individual owns something which the community requires for community purposes, it is but fair, while permitting the community to take it, that he should be paid for it.

It should be added, however, that in Act 222 there is not any legislative finding or declaration that any such emergency exists and that upon the record now before us it has not been shown that it does exist. The average daily supply of water, including both surface waters and those from artesian wells, now enjoyed by the district of Honolulu (from Moanalua to Maunalua) is about 24,000,000 gallons, but of this amount 39%, or more than 9,000,000 gallons, has been daily wasted in transmission and before delivery to the consumers. (See report of sewer and water commission, p. 44.) Within twenty miles from the center of this city there is a supply of water flowing in artificial ditches upon the surface of the earth (brought by tunnel from the Koolau side of the island) which for the ten years from 1918 to 1927 averaged daily a flow of 28,000,000 gallons and in 1928 averaged daily almost 34,000,000 gallons,—all of which is being used by one sugar plantation alone. In addition to this, the same

plantation has available to it other surface waters of an average daily flow of nearly 6,000,000 gallons. These waters are legally available to the people of the community. They can be transported to and for the use of this city and district. The mere fact that the cost may be deemed to be high does not militate against the view that no emergency exists while such a quantity of water is available. That quantity alone now belonging to the one plantation referred to will suffice for a city with more than twice the number of inhabitants which Honolulu now has. Other surface waters available on the Koolau side of the island include over 18,000,000 gallons daily obtainable at an elevation of 500 feet or higher, and 117,000,000 gallons of daily flow irrespective of elevation above sea level. This is additional to the waters coming to this side by tunnel. When we are asked to announce a novel conception of the law of ownership of artesian waters, to-wit, the conception that the Territory is the owner of all of those waters by reason of supposed dire necessity, or when it is suggested that an emergency exists so forceful as to justify the taking of admittedly private property without compensation, the fact of the actual availability of the quantities of surface water above referred to, which are, in part at least, in private ownership, cannot be overlooked. The right of eminent domain can be resorted to by the community whenever these waters are needed. That the probable cost may be deemed by some to be high does not justify the abandonment of long-established conceptions of ownership based upon reason, or the resort to the extreme power of confiscation, if it exists; and we think, as above stated, that it does not exist.

Two decisions of this court are referred to by counsel as possibly indicating that this court prefers the so-called "common-law rule." They are *Davis* v. *Afong*, 5 Haw. 216, and *Wong Leong* v. *Irwin*, 10 Haw. 265. Neither of

these, we think, can be properly regarded as having that effect. In the first counsel did refer to *Acton* v. *Blundell* and *Chasemore* v. *Richards* and a few other similar cases, and the court summarized what those cases held, but disposed of them by simply saying that "applying these principles to the case at bar we find from the evidence that the water comes from these springs into the auwai in known and ascertained channels" and that "they are pointed out by the witnesses and marked on the chart of the land in evidence." It added that "the principles above stated refer to natural streams but they apply equally to artificial water courses as this auwai is." One of the attorneys spoke of the fact that some of the water involved passed "by subterranean percolation from the Pahukii spring into the lower Kalia spring." There was no similarity in the facts of that case to those of the case at bar. What the court decided in that case was, as stated by it in its own syllabus, that "by the rules of ancient Hawaiian agriculture the taro patches of the konohiki are entitled to water from springs on the land." In *Wong Leong* v. *Irwin,* at page 270, the court said: "It is also contended that the natural drainage from the taro lands is down the valley, and that by the diversion the plaintiffs are deprived of the seepage that would otherwise reappear at lower points in springs. The topography of Kailua is such that surface water would naturally flow from defendant's towards plaintiffs' lands, but it is entirely uncertain what direction the water would take after leaving the surface. It is not shown that the seepage in defendant's taro lands would take the course of surface waters, or, if it should, that it would reappear in the lower springs, much less that it would flow underground in known and well defined channels. Subterranean waters, to be the subject of rights, must, like surface waters, in general flow in known and

well defined channels. Gould on Waters, 2d Ed., Secs. 280, 281, citing *Davis* v. *Afong,* 5 Haw. 216, and numerous other cases. Nor could a prescriptive right be acquired to mere drainage water under these circumstances, whether on the surface or underground. *Peck* v. *Bailey,* 8 Haw. 658. At most this would be only a case of *damnum absque injuria."* The general statement there made, that "subterranean waters, to be the subject of rights, must, like surface waters, in general flow in known and well defined channels," must be read in the light of the facts then before the court. That was a case merely of seepage from taro patches on one land to a spring on another land. Neither of these cases can be regarded as authority on the subject of artesian waters.

There was no ancient law or usage in Hawaii relating to artesian waters. The first artesian well ever drilled in these islands was bored in 1879.

The question also occurs whether section 1, R. L. 1925, requires this court to adopt and enforce the so-called "common-law doctrine" above referred to. That section provides that "the common law of England as ascertained by English and American decisions is declared to be the common law of the Territory of Hawaii in all cases except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the Territory, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage." One obvious reason for holding that this section does not operate to prevent the adoption of the view which we prefer is that the so-called "common-law doctrine" was not in fact a doctrine or rule or principle of the common law of England. The earliest decision that we can find rendered by an English court which in any degree approaches or seems to approach this subject, is that of *Acton* v. *Blundell,* decided by the court of Exchequer in 1843. Later judges and text writers have

referred to that case as the earliest English one on the subject of subterranean waters. In that case the facts were that in 1821 "a former owner and occupier of certain land and a cotton-mill, now belonging to the plaintiff, had sunk and made in such land a well for raising water for the working of the mill; and that the defendants, in the year 1837, had sunk a coal-pit in the land of one of the defendants at about three-quarters of a mile from the plaintiff's well, and about three years after sunk a second at a somewhat less distance; the consequence of which sinking was, that, by the first, the supply of water was considerably diminished, and by the second was rendered altogether insufficient for the purposes of the mill." The question argued was in substance "whether the right to the enjoyment of an underground spring, or of a well supplied by such underground spring, is governed by the same rule of law as that which applies to, and regulates, a watercourse flowing on the surface." Tindal, C. J., said that the question before the court was "one of equal novelty and importance" and that "no case has been cited on either side bearing directly on the subject in dispute." *Acton* v. *Blundell,* 12 M. & W. 324, 346, 351. In the absence of authority the various judges considered the case upon reason, seeking analogies with cases of surface waters and differences in principle between those cases and that then under consideration. No reference whatever was made by any of them to any "common law" on the subject or to any established customs or to any accepted views which had been lived up to by owners and users of subterranean waters. They argued as though there were no such common law, customs or accepted views. They said that there were no precedents; and finally Tindal, C. J., said: "The Roman law forms no rule, binding in itself, upon the subjects of these realms; but, in deciding a case upon principle, where no direct authority

can be cited from our books, it affords no small evidence of the soundness of the conclusion at which we have arrived, if it proves to be supported by that law, the fruit of the researches of the most learned men, the collective wisdom of ages, and the groundwork of the municipal law of most of the countries in Europe." In other words, far from applying any common law of England (for there was none) the court confessedly was influenced in its decision by what it deemed to be the Roman law on the subject; and it quoted in support of its conclusion a statement made by one of "the learned Roman lawyers." *Ib.*, 353.

Similarly of *Chasemore* v. *Richards*, 7 H. L. Cases 349, 350, decided in 1859. In that case "the plaintiff was possessed of an ancient mill, with the appurtenances, and was entitled to the flow of a certain stream, called the Wandle, for the purpose of working, using and more conveniently enjoying the said mill" and the defendants, the local board of health of the town of Croydon, "abstracted and prevented the flow of and diverted the water of the said stream away from the said mill * * * and intercepted the flow of and diverted water which ought to have flowed into the said stream and mill, * * * by digging and sinking a well" to the depth of seventy-four feet in ground owned by the town and by pumping water therefrom for the purposes of the town. The distance of the well from the commencement of the river Wandle was about a quarter of a mile. "The question for the opinion and judgment of the court," was "whether, under these circumstances, the said local board of health is legally liable in this action to the plaintiff for the abstraction of water as above described." Mr. Justice Wightman, speaking for the court, said that "the law respecting the right to water flowing in definite, visible channels may be considered as pretty well settled by several modern decisions. * * * But

the law, as laid down in those cases, is inapplicable to the case of subterranean water not flowing in any definite channel, nor indeed at all, in the ordinary sense, but percolating or oozing through the soil, more or less, according to the quantity of rain that may chance to fall." He referred to the earlier case of *Acton* v. *Blundell* as holding "that the owner of the surface might apply subterranean water as he pleased and that any inconvenience to his neighbor from so doing was *damnum absque injuria,* and gave no ground of action;" but did not say that that case had considered or declared the common law on the subject. Instead he said: "There is no case or authority of which I am aware that can be cited in support of the position contended for by the plaintiff or in which the right to subterranean percolating water adverse to that of the owner of the soil came in question, except the nisi prius case of *Balston* v. *Bensted,* and *Dickinson* v. *The Grand Junction Canal Company." Ib.,* 354, 365, 367, 368. He discussed in detail both of the cases which he had named as exceptions, declaring the opinion in the first to be merely a dictum "followed by no decision upon the point," and referring to the other as "arriving at a conclusion which not only does not seem warranted by the premises previously adopted, but is in effect hardly consistent with them." In neither of the cases thus excepted did the court in *Chasemore* v. *Richards* find any declaration of any common law. Mr. Justice Wightman argued the case upon reason as did the other judges who spoke. Lord Wensleydale said: "Your Lordships have, *for the first time,* to decide the question as to the rights of underground water. There are two conflicting authorities; the case under appeal, and that of *Dickinson* v. *The Grand Junction Canal Company,* and your Lordships have to decide between them." *Ib.,* 380. He made no reference

to any pre-existing common law. He evidently knew of none.

The case of *Hammond v. Hall,* 10 Sim. 551, 4 Jur. 694, 59 Eng. Repr. 729, is referred to in *Erickson* v. *Crookston Co.,* 111 N. W. (Minn.) 391, 392, as being "the first English case dealing with underground waters," followed by the statement that "the case which has become recognized as the leading one was *Acton* v. *Blundell,* 12 Mees. & W. 324." *Hammond* v. *Hall* was decided in 1840. The plaintiffs were the trustees, appointed under a local Act of Parliament, with certain specified authority over a plot of ground and a well and pump therein in Queen's Square in the parish of St. George the Martyr, Middlesex, and the defendants were the commissioners appointed under the same Act with certain authority over "the squares, streets, &c., within the united parishes of St. Andrew, Holborn, above the Bars, and St. George the Martyr," and were "empowered to sink wells and erect pumps within the limits of the Act for the purpose of watering the squares, streets, &c., within those limits." Apparently both the smaller plot of ground over which the trustees had jurisdiction and the larger parcels under the care of the commissioners were public property within the power of Parliament to care for and manage. The main question discussed by the vice-chancellor was, as would naturally be expected, the nature and the extent of the powers of the trustees and of the commissioners. There was no issue of conflicting ownerships of the land or of the water. The court did, however, very briefly remark in support of its conclusion adverse to the plaintiffs that "the two wells are at the distance of twenty-three yards from each other; and that the level of the water in the new well is higher than the level of the water in the old one; which shews that the water, if it flows at all, would flow from the new well to the old one; so that an

injury would be done to the old well if the supply of water to it from the new one were to be intercepted;" and that there was "no evidence at all that the wells are supplied by a stream of flowing water or in what other manner they are supplied" but that there was "evidence to shew that the one cannot be supplied from the other" because it was "sworn that the water in each of them does not stand at the same level." The case clearly did not involve a consideration of rights in percolating waters, whether those merely oozing through the soil or those flowing freely in underground strata.

"When it is remembered that the first English case dealing with percolating water arose in 1840, and that it was not decided that the landowner might exhaust the water to furnish a municipal water supply until 1860, it will at once be seen that there was no English law on the subject at the time the common law was adopted by statute, in most of the American states, and that the opinion of the American courts as to what is the common law is as good as subsequent decisions in English courts. Therefore, in any case, the question can be decided on its merits, giving the English decisions the weight to which they are entitled, but without the necessity of regarding them as binding precedents." 3 Farnham, Waters and Water Rights, 2718.

There was no "anciently established rule of the English common law upon the subject." *Meeker* v. *East Orange,* 77 N. J. L. 623, 629.

It is a misnomer, therefore, to speak of the absolute ownership rule as "the common-law rule." There was none such, and section 1 of the Revised Laws does not apply.

It may be added that neither *Acton* v. *Blundell* nor *Chasemore* v. *Richards* was a case involving artesian

wells. They were cases, in the one of a spring coming to or near the surface by nature, and in the other of a stream flowing on the surface, both fed by waters percolating or oozing through the soil. Whether the same English courts, if they had had cases of artesian wells before them, would have adopted the same rule of absolute ownership, no one can say.

It is doubtless true that the police power of the state or the community is extensive and that in spite of the fact that individuals own rights in the whole or a part of the waters of an artesian basin much may be done under the police power to regulate the exercise of those private rights to the end that the health and the safety of the community may be preserved and that the rights of co-owners may not be violated.

"The limitations upon the police power are hard to define, and its far-reaching scope has been recognized in many decisions of this court. At an early day it was held to embrace every law or statute which concerns the whole or any part of the people, whether it related to their rights or duties, whether it respected them as men or citizens of the State, whether in their public or private relations, whether it related to the rights of persons or property of the public or any individual within the State. *New York* v. *Miln,* 11 Pet. 102, 139. The police power, in its broadest sense, includes all legislation and almost every function of civil government. *Barbier* v. *Connolly,* 113 U. S. 27. It is not subject to definite limitations, but is coextensive with the necessities of the case and the safeguards of public interest. *Camfield* v. *United States,* 167 U. S. 518, 524. It embraces regulations designed to promote public convenience or the general prosperity or welfare, as well as those specifically intended to promote the public safety or the public health. *Chicago &c. Railway* v. *Drainage Commissioners,* 200 U. S. 561, 592. In

one of the latest utterances of this court upon the subject, it was said: 'Whether it is a valid exercise of the police power is a question in the case, and that power we have defined, as far as it is capable of being defined by general words, a number of times. It is not susceptible of circumstantial precision. It extends, we have said, not only to regulations which promote the public health, morals, and safety, but to those which promote the public convenience or the general prosperity. . . . And further, "It is the most essential of powers, at times the most insistent, and always one of the least limitable of the powers of government." ' *Eubank* v. *Richmond,* 226 U. S. 137, 142." *Sligh* v. *Kirkwood,* 237 U. S. 52, 58, 59.

It has even been held that "an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use." *Noble State Bank* v. *Haskell,* 219 U. S. 104, 110, citing *Clark* v. *Nash,* 198 U. S. 361; *Strickley* v. *Mining Co.,* 200 U. S. 527, 531; *Offield* v. *R. R.,* 203 U. S. 372; and *Bacon* v. *Walker,* 204 U. S. 311, 315. "It may be said in a general way that the police power extends to all the great public needs." *Bank* v. *Haskell, supra,* 111. "It is well settled that the enforcement of uncompensated obedience to a legitimate regulation established under the police power is not a taking of property without compensation, or without due process of law, in the sense of the Fourteenth Amendment." *R. R.* v. *Tranbarger,* 238 U. S. 67, 78.

The power of the Territory to prescribe reasonable specifications and regulations for the boring of artesian wells and for the use of the same is not disputed by the appellant, but, on the contrary, is expressly admitted. It offers to comply with all reasonable terms and regulations that the commission may prescribe. This is not a controversy concerning the power to regulate. It is solely

a controversy with reference to the power of the Territory to entirely prohibit the digging of the proposed well and the limited, prospective use of its waters which is described in the application. However broad and far-reaching the police power may be, it cannot, we think, be deemed to justify, under the showing made in this case, the prohibition of the appellant's proposed well while at the same time permitting all existing wells to continue to be operated without diminution. The record in this case shows (stipulation filed March 15, 1929,) that there are twenty-seven active artesian wells in the basin in question and that twenty-one of these are being pumped from; that at an approximate distance of 550 feet from the location of the proposed well there is an active artesian well; that in the same basin there are eight wells operated by the City and County of Honolulu and two by the Territory; and that a total of 8,000,000 gallons per day is now being taken from the artesian wells in this basin. As above indicated, the quantity which the appellant proposed to draw from his well is 1,221,000 gallons per month, or about 41,000 gallons per day. If there is any increase already noticeable in the salinity of Honolulu's artesian waters in the basin under consideration it has not been caused by the City Mill Company, the present applicant. That concern has not dug its well yet. It has been caused by those wells which have been already dug and used. The remedy for any threatened increase of salinity is by a lessening of the use already being had and not by wholly preventing the appellant from having his reasonable share of the water. It does not appear, and is doubtless not true, that any of the owners of the existing wells (which includes in a large measure the City and County of Honolulu) have found it necessary to wholly abandon or to diminish the use of the water coming through their wells because of any increase of saltness.

If the impending danger of excessive salinity ever becomes sufficiently pressing it may be that that would justify the state in causing all users to take less water from their wells, or even possibly to take none at all, either temporarily or permanently. Whether existing conditions are such as to justify a requirement by the Territory that the appellant, after boring its well, shall use less water than it needs or desires to use, while at the same time requiring all owners and users of existing wells to be equally limited, need not be now determined. No effort has been made by or on behalf of the Territory to resort to any such remedy. All that need be now said is that it would be abhorrent to a sense of justice and violative of the appellant's rights as a co-owner of the waters in the artesian basin to prevent him from using any of the waters of that basin while at the same time to permit an unrestrained use of the same waters by others of his co-owners.

In our opinion section 5 of Act 222, L. 1927, in so far as it seeks to authorize the Honolulu sewer and water commission to wholly deprive any co-owner of the waters of the basin under consideration, without due compensation, of his right to share in the artesian waters of that basin, violates the provisions of the Constitution and is invalid.

The decision and order of the commission is reversed and set aside. An order will be signed upon presentation, directing the commission to grant a permit to the applicant as prayed for, upon such reasonable specifications and regulations concerning the boring and the maintenance of the well as may be prescribed in accordance with law.

*I. M. Stainback* (*Huber, Kemp & Stainback* on the briefs) for petitioner.

*C. E. Cassidy*, Deputy City and County Attorney (also on the brief), for respondents.